Per Curiam::
This case was referred to Trial Commissioner David Schwartz with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Bule 134-(h). The commissioner has done so in an opinion and report filed on August 16, 1971. No exceptions to or brief on the commissioner’s report have been filed by the parties and the times for so filing pursuant to the rules of the court have expired. On December 8,1971, defendant filed a motion requesting that the court adopt the commissioner’s opinion, findings of fact and recommended *370conclusions of law as the basis for its judgment in this case. Plaintiff has filed no response, the time for so filing has expired and the case has been submitted to the court without oral argument.
Since the court agrees with the commissioner’s opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby, granting defendant’s motion, adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover and the petition is dismissed.
OPINION OP COMMISSIONER
Schwartz, Oormvissioner: This is a suit brought under 28 U.S.C. § 1491 for damages for an alleged wrongful taking, appropriation or disclosure by the Government of proprietary information or trade secrets of the plaintiff.
Plaintiff claims that in connection with, its proposals on and its performance of contracts with the Government, the latter learned in confidence certain trade secrets or proprietary data concerning a “wheel mover” for B-52 aircraft which had been developed by plaintiff, and that the information was thereafter publicly disclosed.
A wheel mover is a vehicle, in physical appearance somewhat resembling a tractor, whose function it is to move large aircraft on the ground by the application of power directly to the aircraft’s wheels. The plaintiff’s wheel mover couples to the aircraft by a ring-gear system operably connected to the rim of the aircraft wheels, and hydraulic-power means supply torque through the ring gear to turn the wheels of the aircraft. By the use of a wheel mover the aircraft’s own weight helps to move it without operation of its engine. The primary value of a wheel mover is added maneuverability of the aircraft over low-friction surfaces such as snow or ice-covered runways. Wheel movers have not come into general use. Less than 100 were ever acquired by the Government and there is no evidence of any production for non-Government use.
Plaintiff’s claim is that eleven stated trade secrets or items of proprietary information owned by it were publicly dis*371closed (a) in a Government procurement specification, MIU-W-27199, for a wheel mover; (b) by the Government having made available to bidders, for inspection and study, a prototype wheel mover which plaintiff had previously built under contract with the Government; and (c) in certain restricted drawings of the ring gears of the plaintiff’s wheel mover, attached to the mentioned specification.
None of these contentions is borne out by the facts, found after trial and set out in the accompanying detailed findings of fact. Assuming that plaintiff possessed the trade secrets or proprietary information alleged, the offending specification (apart from the ring-gear drawing, discussed below) was a performance specification. It did not tell or prescribe how to accomplish the results it called for and thus it did not disclose any of plaintiff’s secrets. Moreover, the genesis of the concepts and such data as did appear in the allegedly offending portions of the specification was information which at the time the specification was issued was either within the Air Force experience or in the public domain. The public knowledge of plaintiff’s wheel mover came from magazine articles, a brochure describing plaintiff’s wheel mover in detail, distributed by plaintiff at the time it was tested, and from public displays of plaintiff’s wheel mover during testing. Plaintiff seems to have made no effort to conceal any of the features of its wheel mover. To the contrary, it seems deliberately to have publicized the details of its device, apparently relying on its know-how and on the virtues of its product to insure that it became the sole source of supply for users, including the Government. Ultimately, the Government sought competitive bids on a wheel mover to be freshly designed to performance specifications, and a manufacturer of a different type of wheel mover was awarded a contract for the very few wheel movers produced.
As to the prototype wheel mover, no proof was presented that the Government actually made it available for study and inspection by bidders. If, however, it was in fact made available, the Government was within its rights. An earlier, unrestricted sale of the vehicle by the plaintiff to the Government had extinguished plaintiff’s rights. Cf. Sears, Roebuck *372& Co. v. Stiffel Co., 376 U.S. 225, 231 (1964) ; United States v. Arnold, Schwinn & Co., 388 U.S. 365, 377-78 (1967).
Finally, there are the ring-gear drawings, which were plaintiff’s, and were published by the Government (and, incidentally, not used by the successful bidder). I find that plaintiff authorized the Government’s use of the drawings in connection with the issuance of the specifications, No. MIL-W-27199. This finding embodies a decision on the credibility of witnesses who gave conflicting testimony at the trial. Little purpose would be served by stating the testimony in detail. It is enough to say that a Government officer and the then representative of the plaintiff testified that the officer requested authorization and that the representative gave it, after clearance by one of two officers of the plaintiff, and that the two officers of the plaintiff testified, directly to the contrary, that no such clearance had been asked for and none had been given.1 The conclusion that permission was given is consistent with the plaintiff’s free disclosure of the technical details of its wheel mover.
Plaintiff has failed on the facts to make out a case of unauthorized publication of any secrets. There is no need, therefore, to discuss either plaintiff’s various theories of action, based on contract and constitutional taking, or defendant’s defenses, relating to jurisdiction, the authority of Government servants and the alleged confidential relationship between the parties.
The petition should be dismissed.
FindiNGS oe Fact
L This is a suit by a domestic corporation, Condec Corporation (herein “Con Diesel” or “CDEC”), formerly known as Consolidated Diesel Electric Corporation, brought under *373Title 28 U.S.C. § 1491 for damages for an allegedly wrongful taking, appropriation or disclosure of proprietary information and secret data owned by the plaintiff and obtained by the Government from plaintiff in the course of contractual relations.
Early Development of the Wheel Mover
2. In 1949, the Air Force, through its Aeronautical Systems Division (ASD), Wright-Patterson Air Force Base, Ohio, began a project to document and study all of the known methods of moving heavy aircraft on the ground under adverse conditions, such as when runways are covered with snow and ice.
3. The ASD requested its Central Air Documents Office to make a search of pertinent literature on the subject, including patents, both foreign and domestic, to ascertain what had been done in the field. The search revealed several patents.
At about the same time, there were working for the ASD at Wright-Patterson Field several German scientists, including a Dr. Kamm, who had done some work for the Air Force on a device for moving aircraft under adverse conditions. The Division’s Project Engineer, Mr. William Gregory (who as the leading figure in the development of ground support equipment for aircraft, played a large part in the case) had seen Dr. Kamm’s papers and was familiar with his proposal, which was for a hydraulic type unit which attached to the wheels of the aircraft. Because, of the terms and conditions under which such scientists were brought to this country, it would not have been possible for Dr. Kamm to patent his device if he had sought to do so.
4. Plaintiff Con Diesel is a manufacturer, largely for the Department of Defense, of electromechanical and electronic equipment such as engine generator power plants. In 1951 plaintiff became involved in research, engineering development and production of ground support equipment able to move aircraft on the ground and incorporating devices for furnishing electrical power for starting and servicing of aircraft.
*3745. In 1955., the Air Force was beginning to put into use its B-52 bomber fleet. The B-52 is an exceptionally large and heavy aircraft, weighing 300,000 to 500,000 pounds. The Air Force was experiencing difficulty in moving these planes on the runways and in and about the other areas of the bases in northern locations where adverse weather conditions prevailed in winter, with ice and snow often on the runways and taxiways. Kepresentatives of the Aeronautical Systems Division made trips to a number of Air Force bases to observe the conditions and problems.
6. Plaintiff and others, too, recognized the difficulties of moving these and similar aircraft under slippery conditions, with and without the use of the aircraft’s engines, as well as the problems of noise, odor, fuel costs and maneuverability of jet aircraft in docking areas.
7. The plaintiff, during its study through 1955 and 1956 of the problem of moving heavy aircraft, concluded that, in order to obtain the best maneuverability, it was necessary to develop a device which would utilize the weight of the aircraft itself in moving the aircraft and which could be controlled either by the pilot in the cockpit, by some one walking alongside the aircraft or in a vehicle attached to the aircraft. The solution was accomplished by a device which attached to the wheels of the aircraft. An exhaustive study of the state of the art during this period of development demonstrated that no device existed or had been put into practice that could provide for the movement of aircraft in the 300,000 to 500,000 pound class over slippery surfaces, by the application of torque directly to the wheel of the aircraft, considered by the plaintiff to be the best method of applying moving energy to the wheels. The only related devices in existence at that time were the LeTourneau-Westinghouse electric drive unit, which was an electric motor built into the wheel of a he'avy truck for use as earth-moving equipment, and a friction type device developed by Boeing Airplane Company, in which a drive roller rubbed against the aircraft tire, but which could not move heavy aircraft over snow or ice.
8. In 1956, following extensive experiments, the plaintiff *375decided to proceed with a wheel mover development program. Plaintiff thereupon began to make concept and layout drawings, conduct various tests into the practicability and workability of various hydraulic and mechanical linkage devices, make artist renderings and finally make a detail engineering analysis and layout drawings which ultimately led into detail design procedures of normal developmental engineering.
9. The term “wheel mover” is a general term used to refer to a heavy, tractor-type machine, which can be fastened to the wheels of a heavy aircraft and, by use of hydraulic or other power, provides the power to turn the wheels of the aircraft itself, thus moving the aircraft. In layman’s language, it may be said to resemble a tractor, and its function is to move the aircraft. However, it differs from a tractor in the highly important and significant respect that it fastens to the wheels of the aircraft, and supplies the necessary power to turn those wheels in order to move the aircraft instead of simply towing the aircraft; it thus utilizes the weight of the aircraft in accomplishing the objective of moving it, and, of course, does not require that the aircraft use its own power to “taxi”, as is often seen in connection with conventional, commercial aircraft.
10. In 1956, also, plaintiff conducted a study of the market potential for a wheel mover. As a result of this study, a substantial civilian and military market was anticipated.
11. In 1957 the Air Force began experimenting with a 150,000-pound device to clear a loaded B-52 aircraft off a runway in case of a crash. This experimentation resulted in the development of a 225,000-pound truck with an electric motor drive.
The “Aviation Week” Articles on Plaintiff’s Wheel Mover
12. In 1957, Mr. Gregory, whose central position has been mentioned in finding 3, became aware of an aircraft wheel mover unit manufactured by plaintiff Con Diesel through an article published in the magazine “Aviation Week,” on October 7,1957.
13. The article contains a statement of the basic principles and features of the wheel mover unit which plaintiff had *376produced. Photographs and sketches of features of the unit are included. Of particular relevance is one photograph which shows twin hydraulic pumps which serve to turn the aircraft wheels, and a ring gear (to be considered in detail below) which transmits the power from the twin pumps to the wheels of the aircraft. One of the sketches showed how the wheel mover unit would be attached to the aircraft wheel gear.
An article about plaintiff’s wheel mover had appeared in “Aviation Week” a year earlier, on October 22, 1956. It stated that the unit, which was then moving into the prototype production stage, “is to have hydraulically-actuated wheel power units attached to one wheel of each main landing gear drive” of the aircraft while it was on the ground. The article also contained the following paragraph:
(The idea of outside hydraulic power to supply motive power to aircraft is not new. Sikorsky uses it to position its large, twin-engine HR2S Marine helicopters (AW Feb. 8, 1954, p. 11). Sikorsky’s version consists of two, small hydraulic motors which can be quickly attached to the copter’s main wheels to facilitate handling in crowded carrier decks. Power is supplied by an auxiliary power unit.)
14. A week later, on October 14, 1957, a third article on plaintiff’s wheel mover appeared in “Aviation Week.” It set forth a summary of several revisions and additions which plaintiff had made in the unit. One such revision was described by the article as follows:
Power of wheel mover may be transmitted to plane through a set of expanding brake shoes reacting against the inner rim of the main wheels. Power to expand the brakes will be taken from the power vehicle’s hydraulic pumps.
Plan is to try ring gear on prototype installation, expanding shoe brakes on the next installation. If brakes work, production units will be standardized on their configuration. If problems arise, such as foreign matter or ice on the wheel rims, making use of brakes impractical, Con Diesel plans to return to the ring gear. Company says .that Bendix Products, maker of the wheels, has agreed to cast the ring gear integrally with production wheels if its airline customer’s want it to.
*37715. Between December 11,1957 and December 17,1957, the prototype wheel mover unit developed by plaintiff was tested at Seattle, Washington, on a 707, a commercial aircraft produced by the Boeing Airplane Company.
16. These tests in Seattle successfully demonstrated the soundness and efficacy of the application of the plaintiff’s wheel mover units in moving the Boeing 707 aircraft, and that either the pilot, sitting in the aircraft, or a ground crew could completely control the forward or reverse speed of the aircraft in a straight line or in any turning requirement without utilizing the engines of the aircraft.
The First Contract With Plaintiff, No. 36520 of March 5, 1958
17. On December 19, 1957, the Air Force, indicating Con Diesel as a source of supply, directed the procurement, for service testing, of an unconventional aircraft towing vehicle and component accessories, the latter to include two sets of torque reactors, capable of moving B-52 aircraft on the ground. The authorization set forth certain basic requirements, providing, inter alia, that the ground power unit itself, as distinguished from the wheel mover units (which attached to the aircraft wheels and turned them in order to move the aircraft), would not be purchased outright, but would remain the property of the contractor, and, further, that the other items of the procurement would become the property of the Government.
18. The directive noted the persistent difficulties being experienced by the Air Force in moving heavily loaded tactical aircraft on the ground under snow and ice conditions in areas north of the 38th Parallel; that existing equipment was not capable of moving such aircraft; that plaintiff had developed and demonstrated a prototype item which was believed to be a possible means of resolving this problem for the Air Force.
19. The procurement was considered by the Air Force to be urgent, inasmuch as it wanted the unit in time for testing during the winter months. Accordingly, the Chief of the Special Purpose Vehicle Section in the Equipment Branch, Air Force Logistics Command, Wright-Patterson Air Force *378Base, Mr. Bobert E. Hickey, promptly requested Con Diesel to submit its proposal as soon as possible.
20. By letter dated December 20, 1957, to Mr. Hickey’s attention, Con Diesel proposed to:
a) Design and build a set of wheel mover units and torque reactor arms suitable for the B-52.
b) Design and build the necessary parts to modify the B-52 wheels to be compatible with this system and to incorporate these parts in the wheels.
c) Modify our prototype wheel mover power supply vehicle to be compatible with the control system contemplated for the B-52.
d) Loan our modified prototype vehicle (c above) for use m tests with the B-52 m early 1958.
e) Provide transportation of the wheel mover units, the modified wheels, and the power supply vehicle from Stamford, Connecticut to Westchester County Airport, New York.
The letter also stated that upon completion of the tests, the wheel movers, their torque reactor arms, and the modified wheels would remain with the United 'States Air Force, while a modified wheel mover power supply vehicle would remain the property of Con Diesel.
Additionally, the letter stated as follows:
The proposed price for the design, fabrication and modification described above is $99,999.99, and the completed system will be delivered by 15 April, 1958, if we receive a contract by January, 1958.
21. The Government did not request a quotation on “Table 252” data, and Con Diesel’s proposal did not contain or refer to a Table 252 contract article or Table 252 data. Table 252 is a description of data, such as engineering drawings, specifications and spare parts lists, which the Government may wish to buy in conjunction with and in addition to an article or articles procured under a contract. The Government sometimes desires to purchase such data for use in reprocurement, maintenance of the principal article being furnished or spare parts procurement. When this is so, a Table 252 is included in the request for proposals and the bidder is asked to set forth in its bid a price for such data.
22. On the morning of December 23, 1957, Mr. Hickey *379telephoned Mr. Gerald Eosenberg, plaintiff’s vice-president, who had signed the proposal, and advised him that the Air Force also desired to purchase engineering drawings and specifications. Mr. Eosenberg advised that he would go over the matter with others on his staff and call Mr. Hickey back.
That afternoon, Mr. Eosenberg called Mr. Hickey and advised that he could not give a price at that time for the drawings, etc.; that it would require at least 60 days to assemble Con Diesel’s costs; and that it could not deliver such drawings until at least 90 to 120 days after delivery of the units. He also advised that plaintiff would be willing at a later date to negotiate a contract for such a purchase,
23. Shortly thereafter, on December 27, 1957, a procurement plan was prepared and approved within the Air Force for the procurement from Con Diesel of four wheel mover units and two torque reactors, and for modification and use of the contractor’s power supply vehicle. The Air Force often, as noted previously, bought engineering data and drawings for service test equipment which it procured; the instant procurement plan included an allowance for such an additional purchase. The amount allowed was an estimated $25,000 for Table 252 data; $15,000 for maintenance data; and $5,000 for special tools.
24. On January 7, 1958, the parties entered into Letter Contract No. AF 33 (600)-36520. The contract provided, inter alia, as follows:
I — Articles To Be Furnished and Woeu To Be PERFORMED
Item 1. — Modify the Contractor-owned prototype wheel mover power supply vehicle (MPTJ) as required to be compatible with the control system contemplated for B-52 Type Aircraft and Wheel Movers therefor. Said Contractor-owned wheel mover power vehicle, together with such modifications made, and accessories added thereto, under this Item 1 shall remain the property of the Contractor, subjectj however, to the rights of the Government to use vehicle for testing purposes as provided in Item 2 below.
Item £. — Furnish the Contractor-owned prototype wheel mover power supply vehicle, as modified under Item 1 above, complete with all control apparatus, to the *380Government for a period of approximately 90 days for testing purposes in connection with the use of the wheel mover system on B-52 Type Aircraft at such airports and/or Air Bases as the Government may select. It shall be the responsibility of the Contractor under this Item 2 to ma.Trpi all repairs of said vehicle, while it is in the possession of the Government, necessary for the successful completion of testing of the wheel mover system.
Item §. — Modify four (4) each Government-owned B-52 Type Aircraft Wheels; such modification to include the design, fabrication and incorporation of all parts necessary to make said wheels compatible with the B-52 wheel mover system.
Item If,. — Fabricate and furnish four (4) each wheel mover power units to be compatible with (i) the power supply vehicle as modified under Item 1 above and accessories therefor, (ii) the B-52 wheels modified under Item 3 above and (iii) the torque reactors to be furnished under Item 5 below.
Item, 5. — Fabricate and furnish (i) two (2) sets of torque reactors to be compatible with the wheel mover power units to be furnished under Item 4 above and (ii) any other components and accessories required to operate the wheel mover system in propelling B-52 Aircraft on the Ground.
II — GoVERNMENT-FtJRNISHED PROPERTY
The Government shall furnish and deliver to the Contractor as “Government-Furnished Property” four (4) each B-52 Type Aircraft Wheels (Stock No. 4111-3-825-2) for modification under Item 3.
Ill — ENGINEERING DATA
In the event the Government desires to procure Engineering Data for the wheel mover system to be furnished under this Contract (including the Contractor-owned power supply vehicle) and desires that the requirement for such data be included in the definitive contract, the Contractor agrees (i) to furnish such data in accordance with Table 252 (Form MCP 71-513 dated 1 November 1956), incorporated herein by reference, at such price therefor as may be established by negotiation, and (ii) that the clause of this Contract entitled “Eights In Data — Unlimited,” as incorporated in this Contract by reference thereto in Clause 3 hereof, shall be applicable to such data.
*38125. The “Eights In Data — Unlimited” clause referred to in part III of the foregoing contract as incorporated by reference (and not carried forward into the definitive contract (see finding 30 below)), provided as follows, per a text in use about that time:
Eights IN Data — Unlimited
(a) The term “Subject Data” as used herein, includes writings, sound recordings, pictorial reproductions, drawings, or other graphical representations, and works of any similar nature (whether or not copyrighted) which are specified to be delivered under this contract. The term does not include financial reports, cost analy-ses and other information incidental to contract administration.
(b) Subject to the proviso of (c) below, the Government may duplicate, use, and disclose in any manner and for any purpose whatsoever, and have others so do, all Subject Data delivered under this contract.
(c) The Contractor agrees to and does hereby grant to the Government, and to its officers, agents; and employees acting within the scope of their official duties, a royalty-free, non-exclusive and irrevocable license throughout the world, to publish, translate, reproduce, deliver, perform, dispose of, and to authorize others so to do, all Subject Data now or hereafter covered by copyright; provided that with respect to such Subject Data not originated in the performance of this contract but which is incorporated m the work furnished under this contract such license shall be only to the extent that the Contractor, its employees, or any individual or concern specifically employed or assigned by the Contractor to originate and prepare such Data under this contract, now has, or prior to completion or final settlement of this contract may acquire, the right to grant such license without becoming liable to pay compensation to others solely because of such grant.
(d) The Contractor shall exert all reasonable efforts to advise the Contracting Officer, at the time of delivery of the Subject Data furnished under this contract, of all invasions of the right of privacy contained therein and of all portions of such Data copied from work not composed or produced in the performance of this contract and not licensed under this clause.
(e) The Contractor shall report to the Contracting Officer, promptly and in reasonable written detail, each *382notice or claim of copyright infringement received by the Contractor with respect to all Subject Data delivered under this contract.
(f) Nothing contained in this clause shall imply a license to the Government under any patent or be construed as affecting the scope of any license or other right otherwise granted to the Government under any patent.
(g) The Contractor shall not affix any restrictive markings upon any Subject Data, and if such markings are affixed, the Government shall have the right at any time to modify, remove, obliterate or ignore any such marking.
PARO 9-13
MCP 71-613, 9 Apr 57
26. Following issuance of the Letter Contract, and in the course of negotiations which led to the definitive contract, plaintiff offered the engineering data to defendant for $750,-000, or at no cost if the Air Force would place an order for 200 wheel mover units at a price of $35,000 each. Mr. TIickey, the Chief of the Special Purpose Vehicle Section, conferred with his superiors about the matter and it was decided not to procure such data at that time. The Air Force, in its procurement plan (finding 23, supra) had allowed $25,000 for such data. This estimate of the price of the data was based on experience in other procurements of engineering drawings at costs ranging from $5,000 to $50,000, the instant sum $25,000, being a median figure.
27. By letter to the Air Force dated February 17, 1958, Con Diesel confirmed certain decisions reached by the parties at meetings held in Mr. Hickey’s office on February 12 and 13, 1958, with respect to price, work to be performed and other related matters, which were thereafter incorporated into a definitive contract, referred to in the next finding.
28. The definitive contract between the parties, No. AF 33(600)-36520, was thereafter entered into as of March 5, 1958. It contained, inter alia, the following provisions:
PáRt I — Work To Be Performed AND Articles To Be FtjrNished
(a) The Contractor shall, within the time specified elsewhere herein, perform the work and furnish and deliver to the Government the articles described below:
*383Item 1. — Modify the Contractor-owned prototype wheel mover power supply vehicle (MPXJ) as required to be compatible with the control system contemplated for B-52 Type Aircraft and Wheel Movers therefor. Said Contractor-owned wheel mover power vehicle, together with such modifications made, 'and accessories added thereto, under this Item 1 shall remain the property of the Contractor, subject, however, to the rights of the Government to use vehicle for testing purposes as provided in Item 2 below.
Item £. — Furnish the Contractor-owned prototype wheel mover power supply vehicle, as modified under Item 1 above, complete with all control apparatus, to the Government for a period of approximately 90 days for testing purposes in connection with the use of the wheel mover system on B-52 Type Aircraft at such airports and/or Air Bases as the Government may select.
Item 3. — Modify four (4) each Government-owned B-52 Type Aircraft Wheels; such modification to include the design, fabrication and incorporation of all parts necessary to make said wheels compatible with the B-52 wheel mover system.
Item /. — Fabricate and furnish four (4) each wheel mover power units to be compatible with (i) the power supply vehicle as modified under Item 1 above and accessories therefor, (ii) the B-52 wheels modified under Item 3 above 'and (iii) the torque reactors to be furnished under Item 5 below.
Item 5. — Fabricate and furnish (i) two (2) sets of torque reactors to be compatible with the wheel mover power units to be furnished under Item 4 above and _ (ii) any other components and accessories required to operate the wheel mover system in propelling B-52 Aircraft on the Ground.
TOTAL PKICE, ITEMS 1 THROUGH 5— $98,000.00.
(b) The wheel mover system referred to in Paragraph (a) above of this PAKT I, shall (i) conform to the requirements of Consolidated Diesel Electric Corporation document entitled “Specification, B-52 Prototype Wheel Mover System, Model 2083”, dated 3 February 1958, incorporated herein by reference, and (ii) shall be developed with the design objectives set forth in *384Exhibit A, attached hereto and made a part hereof. Prior to delivery of the wheel mover system, the Contractor shall check said system in accordance with the procedure set forth in Exhibit “B”, attached hereto and made a part hereof.
Past II — Responsibility For Design AND PERFORMANCE
The Contractor hereby assumes full responsibility for the design of a ground movement power unit system for B-52 Type Aircraft that will serve the purpose for which it is intended, ground movement of a B-52 Aircraft.
Part III — Government-Furnished Property
The Government shall furnish and deliver to the Contractor as “Government-Furnished Property” four (4) each B-52 Type Aircraft Wheels (Stock No. 4111-3-825-2) for modification under Item 3.
Part VI — Delivery Schedule
All work to be performed by the Contractor under this Contract shall be completed and all articles to be furnished by the Contractor shall be delivered to the Government on or before 15 April 1958.
Part VII — Point For Final Inspection And Acceptance
The plant of the Contractor at Stamford, Connecticut, is hereby designated as the point for final inspection and acceptance of all articles to be furnished under this contract.
EXHIBIT “a” TO CONTRACT NO. AF33 (600)-36520
The wheel mover system shall be developed with the following design objectives:
(a) To be constructed in a manner that installation of the B-52 Aircraft and removal from said aircraft can be accomplished without the use of hand tools.
(b) Each individual wheel mover shall be capable of being coupled to the B-52 Aircraft by a 2 man crew in 5 minutes.
(c) Each individual wheel mover shall be cap*385able of being uncoupled from the B-52 Aircraft in 5 minutes.
(d) To be capable of moving the B-52 Airplane without use of aircraft engine or any; power plant installed as a component part of the airplane.
(e) To be capable of moving the B-52 airplane up grades of 2%.
(f) To be capable of moving the B-52 airplane weighing 350,000 lbs. gross weight at a speed of 2 miles per hour on level concrete.
(g) To be capable of operating at sea level, temperature from +25°F. to +110°F.
(h) To eliminate the requirement for towbars currently being used.
(i) To be air transportable in C-119 Aircraft without disassembly.
(j) To be capable of being maintained at squadron level by personnel normally assigned to airplane maintenance crews.
(k) To be constructed in a manner that all components are readily accessible for maintenance and/or replacement.
29. The Letter Contract was not “converted”, but was superseded by the definitive contract; the definitive contract expressly so stated in paragraph 39, as follows:
39. PRIOR INSTRUMENT SUPERSEDED.
This is the Definitive Contract contemplated by Letter Contract dated 7 January 1958 and designated Contract No. AF 33 (600)-36520 and supersedes said Letter Contract. Any costs incurred or payments made thereunder will be considered to have been made under this Definitive Contract.
30. The said definitive contract did not contain either the Engineering Data clause or the Bights in Data-Unlimited clause which had been included in the letter contract (finding 24, supra).
Neither the letter contract, dated January 7, 1958, plaintiff’s letter of February 17,1958, nor the final definitive contract, dated March 5, 1958, contained any mention of trade secrets or proprietary data.
31. Formal acceptance by the Government of the articles to be furnished under the contract took place at the contractor’s plant in Stamford, Connecticut, on April 15, 1958. *386Together with the power supply vehicle, which the contract provided would be loaned to the Government for the test to be conducted, the articles were shipped to Loring Air Force Base, Maine, for functional tests to determine suitability of the drive principle employed, under extremes of weather and ramp conditions.
32. The articles which were delivered to the Government and to which it acquired title under the aforementioned contract No. 36520 were the B-52 wheels with the ring gears installed (the wheels themselves having been furnished to the contractor as Government Furnished Property under Part III of the contract, set forth in finding 28, sufra; the gear reduction boxes and ring gear; the hydraulic drive motors; the hydraulic lines, tubing and pumps; torque reactor; and related framework for the above-mentioned items (contract 36520, Part I, finding 28, sufra).
The articles delivered to the Government under this contract contained all ten of the items, features or devices which plaintiff subsequently, by letter dated September 18, 1958, asserted were proprietary features. Finding 44, infra. These items were identified in that letter and have been identified in the case as follows:
1. Wheel Mover Unit.
2. Application and Eeaction of Torque.
3. Indexing and Automatic Alignment.
4. Positioning and Attachment devices.
5. Hydraulic Power Application System, Multi-Speed, Multi-Pressure, Limited Slip Differential.
6. Selective Single or Dual Operation.
7. Electric Hydraulic Servo System.
8. Speed and Direct controls (Less Eemote Steering).
9. Vehicular Eetracting System.
10.Vehicular Satelliting.
In the instant suit, plaintiff claims that these items, plus one other feature called “Underbelly Configuration,” were proprietary.
Thus, of the 11 features claimed in the suit, 10 were received by the Government, among the articles it bought, and received, from plaintiff under contract No. 36520 of March 5, *3871958. Only the “Underbelly Configuration” was not among those articles.
Tests at Loring Air Force Base in April 1958 of Plaintiff’s and Others’ Wheel Movers
33. The Air Force procured wheel movers from two sources in addition to plaintiff — Napco, Inc. and Air Logistics Corporation. Wheel movers manufactured by all three were tested at Loring Air Force Base on April 22-24, 1958.
34. There were a considerable number of people present for these tests, including not only representatives of various branches of the Air Force, but also personnel of commercial air lines and from each of the three companies whose units were being tested. All of the persons present had free access to, and saw, each of the three units tested, in the sense that they were able to observe the vehicles without interference.
35. The tests revealed a number of deficiencies in the Con Diesel equipment from the standpoint of the operational needs of the Air Force. Mr. Gregory, who was present, prepared the official functional evaluation report on this equipment, Technical Memorandum WCLE-TM-58-48, dated May 28,1958, which stated, in part, as follows:
III. CONCLUSIONS
1. It is concluded that:
a. The drive principle employed in the wheel mover units, i.e., application of moving energy directly to the airplane wheels, is considered sound and exhibited better performance than other type drives tested because external conditions such as snow, ice, rain, sleet, oil spills, etc. do not adversely affect drive system.
b. The complete wheel mover and power plant, Consolidated Diesel Electric Corporation Model WM-500 is not suitable for Air Force use in towing B-52 aircraft weighing 400,000 pounds and over under extremes of weather and ramp conditions such as encountered at Loring Air Force Base, Maine, due to the deficiencies outlined below:
(1) Excessive time and personnel required to couple and uncouple towing devices.
*388(2) Extreme difficulty in mating ring gear and drive pinion under normal temperature conditions. This condition would be severely aggravated in temperature 0°F and below.
(3) Complexity of plumbing required to control flow of fluid used in hydraulic drive.
(4) Inadequate ground clearance of power unit.
(5) Eequirements for casters on wheel mover units and power plant. Such running gear is entirely unsuitable for use in deep snow and ice.
(6) Bulkiness of the power plant.
(7) Wheel mover units not compatible with compass rose towing operations.
(8) Complete wheel mover and drive system not compatible with post flight docks used at Loring Air Force Base.
(9) Necessity of operating the controls from the cockpit of the airplane. Complete control should be possible from the ground.
The Government’s Decision To Procure and Test Additional Wheel Movers
38. As a result of these tests, the Air Force concluded, as shown by the foregoing report of May 28, 1958, that the principle involved was good but that the mover was not suitable as a piece of operational equipment, and that a further procurement was necessary, in order to attempt to obtain equipment which eliminated the above-described deficiencies. The report further recommended that a limited quantity of wheel movers be available for testing at Loring Air Force Base by not later than December 31,1958.
37. On June 6, 1958, Air Force Headquarters advised the Air Development Center, Wright-Patterson Air Force Base, that the tests at Loring Air Force Base were considered inconclusive and that it desired tests of competitive wheel movers during the winter of 1958-1959. It directed that a performance specification be prepared suitable for the procurement of one each of two or three alternate means of accomplishing the desired goal, namely, of moving B-52’s under cold weather conditions by the application of torque to the aircraft gear. It further directed that it be informed by not later than June 10,1958, of the action being taken.
*389Air Force R & D Specification WCLEG-58-48
38. In order to effect such a procurement, the Air Force prepared a specification, drafted by the Project Engineer previously referred to, Mr. William Gregory, setting forth in considerable detail the performance requirements of the wheel mover desired by the Air Force. The specification, dated June 20,1958, with an amendment dated June 27,1958, attached thereto as Attachment “A”, was designated Research and Development Exhibit WCLEG-58-48, Wright Air Development Center, Wright-Patterson Air Force Base.
In preparing this specification, the Air Force, through its representatives, and especially through Mr. Gregory and those with whom he maintained liaison in carrying out the preparation of this specification and related work, had not only the knowledge gained through examination of the “Aviation Week” article of October 7, 1957, describing and depicting the Con Diesel unit, but had recently observed the tests at Loring Air Force Base, April 22-24,1958. In addition, the Air Force now possessed and had title to the articles procured from Con Diesel under contract No. 36520, containing ten of the eleven features plaintiff thereafter alleged to contain its trade secrets and proprietary information (finding 32, supra).
39. In furtherance of the aforesaid procurement objective, the procurement personnel at Wright-Patterson AFB issued, on July 9, 1958, a Procurement Plan setting forth the details of the planned procurement. It contemplated use of the performance specification that had recently been completed, R. & D. Exhibit WCLEG-58-48, mentioned in the foregoing finding. It included a timetable calling for issuance of the request for proposals by July 15, 1958; award of the contract (s) by September 15, 1958; and delivery by December 15,1958. It provided for the procurement of wheel movers (one of each type); spare parts; and maintenance data. It also provided that the Air Force would have the option to buy engineering data for the wheel movers, as described in Table 252. The buyer for this procurement was Lt. Richard E. Lasselle.
*390RFP 5002 of July 19> 1958
40. Pursuant to the aforesaid plan, a request for proposals was issued on July 15, 1958, designated RFP 33-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, calling for bids no later than August 14,1958. It based the procurement on the aforesaid specification of June 20, 1958, WCLEG-58-48, and provided that the Air Force would have the optional right to buy engineering drawings. Paragraph 1 of the RFP stated as follows:
1. ARTICLES AND/OR DATA TO BE FURNISHED
Item 1. — Vehicle, Aircraft Movement, Unconventional Type, Complete, for Aircraft up to 500,000 pounds gross weight; to be designed, fabricated and subjected to all preproduction tests by the Contractor, in accordance with WADC R&D Exhibit WCLEG-58-48, dated 20 June 1958, incorporated herein by reference, as amended and/or supplemented by Attachment “A” thereto.
Quantity — One (1) Each — Total Price $_
Item 2. — Spare Parts to support Item 1, preceding, for approximately Nine (9) Months duration of Air Force Service Testing; to be selected by the Contractor; selection of any and/or all Spare Parts subject to approval of the Contracting Officer; actual contract price to be established by negotiation at a later date.
Bidder should not insert an amount for this Item 2; however, Bidder by submission of a bid agrees to furnish Spare Parts as provided herein.
Quantity — One (1) Lot — Total Price, None.
Item 3. — Engineering Data for Item 1, preceding, to be in accordance with Table 252, attached hereto and made a part hereof. This is a firm requirement, and failure to agree to furnish this data requirement may be cause for rejection of the entire bid.
The Air Force reserves the optional right to obtain Table 252 Data on any and all items produced as a result of this proposal and reserves the privilege of exercising this option up to a period not to exceed one (1) Calendar Year from date of any contract award.
Quantity — One (1) Lot — Total Price $_
Item /. — Maintenance Data (Commercial Handbook of Operation, Service and Overhaul Instructions) for Item 1, preceding.
Quantity — One (1) Lot — Total Price $__
*391The EFP also provided, inter alia, for the submission by bidders, for the purpose of evaluating the bids, of descriptive literature about their product, showing schematic diagrams of the operation of the equipment, specifically the method to be employed in applying moving energy or torque to aircraft wheels. The EFP did not, however, call for the submission of any engineering drawings.
41. On July 23, 1958, a bidders conference was held at Wright-Patterson AFB for the purpose of acquainting prospective bidders with the objectives of the procurement and to answer questions they might have. Plaintiff’s president was present at the conference, which was attended by 44 persons representing 32 companies, and 9 representatives of the Air Force.
Plaintiff’s Offer of its Engineering Data for $750,000
42. On August 13, 1958, plaintiff submitted its bid in response to EFP 33-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, offering the following prices on the items listed in paragraph 1 of the request, set out in finding 40, supra ;
Item 1 (The Vehicle) $196,376.00.
Item 3 (Engineering Data) $750,000.00.
Item 4 (Maintenance Data) $4,300.00.
43. By letter of the same date, August 13, 1958, plaintiff wrote the Air Materiel Command, Wright-Patterson AFB, addressed to the attention of Lt. Lasselle, the buyer, with regard to the fact that its bid included $750,000 for engineering data under Item 3. The letter explained that this figure represented the planned return on an investment for a research and development program, financed by it, which would normally result in a production run. The letter further advised that Con Diesel would be willing to reduce that sum considerably if a negotiated contract could be written, assuring it a reasonable production contract for the equipment.
44. On or about September 17,1958, plaintiff’s and defendant’s representatives met regarding plaintiff’s proposal. By letter dated September 18,1958, plaintiff advised the Government that it had misinterpreted a portion of the EFP and was in consequence reducing its price from $196,376 to *392$182,942. Further, that its price for engineering data was $15,000, and its price for complete rights to all the equipment, including 10 listed “proprietary systems and components,” was as originally quoted, i.e., $750,000.00, in the following passage:
With respect to Item No. 3, Page 2, in the EFQ, we were asked to break down the costs for the data into two categories, namely — the price for the data only and, secondly, the price for the rights. We were further requested to indicate the rights being sold. We therefore submit a price of $15,000.00 for a complete set of data. Proprietary items will be covered only by drawings sufficient for subassembly identification. The proprietary items listed below were conceived, designed, and manufactured by our company in connection with a commercial aircraft Wheel Mover development program with complete costs paid for by Consolidated Diesel.
1. Wheel Mover Units.
2. Methods of application and reaction of torques.
3. Methods used to provide indexing and automatic alignment.
4. Positioning and attachment devices.
5. Hydraulic Power application system which includes multi-speed, multi-pressure, and limited slip differential action.
6. Selective single or dual system operation.
7. Electric-Hydraulic servo systems.
8. Eemote steering, speed and direction controls.
9. Vehicular retracting system.
10.Vehicular satelliting system.
Should the Air Force decide to buy the complete rights to all the equipment furnished on this unit, including the above listed proprietary systems and components, and in accordance with the requirements of the EFQ, our original quote for Item 3 remains unchanged.
45. Plaintiff claims in this case that in its proposal in response to EFP 5002 it revealed to defendant, in writing and in drawings, the ten proprietary features listed in the said letter of September 18,1958, mentioned in the foregoing finding; see also finding 32.
46. On September 19, 1958, the Air Force’s Director of Procurement and Production directed the procurement personnel to proceed as rapidly as possible to complete negotia*393tions and award contracts to Con Diesel and The American Coleman Co. for one each of their wheel mover units and that every effort be made to have the units available for testing under actual ice and snow conditions during the approaching winter. He also directed that if engineering data could not be procured within the programmed fund ceiling, that the articles should be purchased without such rights, “inasmuch as the Air Force does not yet know what configuration it desires.”
The Government’s Decision Not To Buy the Engineering Data
47. Subsequent to the submission by the plaintiff of the mentioned letter of September 18, 1958, its representatives ■again met with the defendant’s representatives regarding the terms of the proposal. At the meeting there was no indication given that the Government was prepared to accept the plaintiff’s proposal and purchase Table 252 engineering data and proprietary rights for $750,000. Since the Strategic Air Command wanted the contract let promptly, the Government decided to reserve the right to buy the data for a period of a year and to buy the equipment only. The defendant accordingly elected to place an option in the proposed contract to procure these data and rights within one year. The option was never exercised.
The Second Contract With Plaintiff, No. 38249 of October 7, 1958
48. Following the negotiations and correspondence concerning BFP 5002, the defendant submitted to the plaintiff for execution by it, unexecuted copies of the proposed contract AF-33 (600)-88249.
49. The contract, AF 33 (600)-38249, dated October 7,1958, was for one wheel mover, for the price of $182,942.
The contract contained, inter cilia, the following provisions:
PART I. Work to be performed & articles to be furnished:
(a) The contractor shall, within the time specified else*394where herein, perform the work & furnish & deliver to the Government the articles described below:
Item #Jt. One (1) each Vehicle Aircraft movement, unconventional type, complete, for Aircraft up to and including 500,000 lbs. gross weight to be designed, fabricated and subjected to all preproduction test as specified elsewhere herein and WADO R&D Exhibit 58-48, dated 20 June 1958 incorporated herein by reference, as amended and/or supplemented by attachment “A” thereto. Price of Item #1 is $182,942.00.
Item One (1), Lot, Spare Parts to support Item #1 for six (6) months test program conducted by the Air Force. Spare parts will be selected from a Recommended spare parts list referred to in PART VI of this schedule. The contractor shall furnish necessary parts upon receipt of notification from the contracting Officer. Prices for parts will be negotiated and are subject to approval of the Contracting Officer. The sum of $5000.00 has been committed for this Item #2.
Item #3. One (1) Lot of Preliminary Commercial Maintenance data to support Item #1.
Price is included in price of Item #1.
Item One (1) Lot of Photographs for Item #1 in accordance with MPM Exhibit No. 1 hereto.
Price is included in price of Item #1.
PART II. Responsibility for Design & Performance:
The contractor hereby assume full responsibility for the design and fabrication of the article supplied herein in accordance with the approved proposal as submitted under RFQ 33-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. Any alteration, deviation or modification of the subject vehicle and components shall be approved by the Contracting Officer before the alteration, deviation and/or modification is initiated by the contractor.
VI. DELIVERY SCHEDULE:
(a) The Government requires delivery of the supplies listed herein as follows:
Item 1. — to be submitted for testing and approval by the Government within ninety (90) days after receipt by the Contractor of a fully executed and approved copy of this contract.
Item B. — Contractor shall submit selected Spare Parts List to Contracting Officer within forty-five (45) days after receipt by the Contractor of a fully *395executed and approved copy of this contract. Delivery schedule for Item 2 shall be concurrent with Item 1.
Item 3. — Concurrent with Item #1.
Item Jp. — In accordance with MPM Exhibit No. 1 hereto.
X. ENGINEERING DATA:
The Government reserves the right to procure through negotiation all Engineering Data as specified in accordance with Table 252 for a period not to exceed one (1) year from the date of the fully executed contract.
40. RIGHTS IN DATA — UNLIMITED:
[The text of this clause is set forth in finding 25, supra, and, being the same, is not repeated.]
50. On October 9, 1958, the plaintiff returned to the defendant executed copies of contract AF-33(600)-38249, together with its letter of the same date attached thereto which stated that the provisions of the contract were acceptable, upon the plaintiff’s understanding of the terms of the contract with respect to Paragraph 39 of the General Provisions of the Contract entitled “Paragraph 9-4, Patent Eights” as follows:
3. In our letter of September 18,1958, we detailed the items we consider proprietary on the Consolidated Diesel Wheel Mover Equipment. Our acceptance of Paragraph 39 of the General Provisions relating to patent rights is based upon our belief that it is mutually understood that the items listed in our letter of September 18, 1958, were first conceived and reduced to practice prior to the execution of the subject contract, 'and therefore, camiot be construed as coming within the scope of the provisions of Paragraph 39.
(Paragraph 39, relating to ownership of inventions conceived or reduced to practice under a Government contract, is not relied upon by the defendant.)
51. Upon receipt of the executed copies of the contracts from the plaintiff, and after a reference of the portion of the file regarding “rights, data and patent rights” to its legal personnel for approval, the contract was executed on *396behalf of the defendant on October 13,1958, and distributed to the plaintiff.
The Beginning of Air Force Work on MXL-W-27199 (the Allegedly Offending Specification)
52. The Air Force wished to have the wheel mover units it was buying under this procurement tested in the winter of 1958-1959, under snow and ice conditions. The aforesaid contract No. 38249 in its part VI therefore called for delivery within 90 days after receipt by Con Diesel of a fully executed and approved copy of the contract or by 'approximately January 15, 1959 (as the contract had been signed by the contracting officer and plaintiff and approved by higher authority by October 15, 1958).
At about the same time, or soon thereafter, Mr. Gregory and his associates began work on a specification for use in production procurement of this item at a later date. They were aware of the fact that the Strategic Air Command, which would use the wheel movers, would want production orders placed for the equipment as soon as it was satisfied that the test equipment would be satisfactory in operating use. Since the tests were now expected to be held in approximately January or February, 1959, Mr. Gregory and his associates began work on the specifications that they knew would be needed shortly thereafter, if said tests proved satisfactory, so they began at this time, in the early fall of 1958, to prepare such a specification. Its preparation continued throughout the fall and winter and, in due course, was completed and promulgated May 15, 1959, as Military Specification MIL-W-27199, and will be considered in greater detail in subsequent findings.
Plaintiff’s Drawings for Use in Modifying the B-52 Wheels
53. The wheel mover in plaintiff’s proposal (which became contract No. 38249) called for transmitting the torque necessary to move the aircraft by means of ring gears fastened to the aircraft wheels. The wheel mover had gear boxes which, by hydraulics, turned a ring gear in the box. The gear boxes *397were, by an arrangement of linkage arms, attached to the power vehicle which hauled the wheel mover units, thereby making it possible to transport them to the aircraft. Through these linkage arms, the wheel mover gear boxes were placed in a position opposite the aircraft wheels. The ring gear of the driving flange of the gear boxes engaged an opposite ring gear on the aircraft wheel. By hydraulics, the ring gear of the wheel mover gear box was rotated; this, in turn, rotated the wheels of the aircraft, thereby moving the aircraft itself.
Since the wheels of the B-52 aircraft as originally manufactured had no ring gear, it was necessary, in order for plaintiff’s wheel mover to function, to modify the wheels by the addition of the ring gear. The written text of plaintiff’s proposal (which as noted became contract No. 38249) explained that this was necessary and that it was to be accomplished by drilling the wheel with 12 holes and fastening the ring to the wheel with 12 one-fourth inch bolts.
54. The proposal also contained a set of general drawings and sketches of the overall wheel mover unit and major components thereof depicting plaintiff’s wheel mover. Each drawing bore a Restrictive Legend as follows:
This drawing is the property of CONSOLIDATED DIESEL ELECTRIC CORPORATION and same and copies made thereof, if any, shall be returned to it upon demand. Delivery and disclosure hereof are made solely upon condition that the same shall not be used, copied or reproduced, nor shall the subject hereof be disclosed in any manner to anyone for any purpose, as herein authorized, without prior written approval of CONSOLIDATED DIESEL ELECTRIC CORPORATION. This drawing is submitted confidentially and may not be used in the manufacture of any material or product other than such materials and products furnished to CONSOLIDATED DIESEL ELECTRIC CORPORATION. Whether or not the equipment or information shown hereon is patented or otherwise protected, full title and copyrights, if any, in and to this drawing and/ or information delivered or submitted are fully reserved by CONSOLIDATED DIESEL ELECTRIC CORPORATION.
*398One drawing, X-8581, showed graphically, but not to exact scale it was labeled “Do Not Scale Drawing”), the necessary modification to the B-52 wheels, described in the foregoing finding.
55. By memorandum dated October 31, 1958, Mr. H. L. Kimball, the head of the Propellers, Wheels and Brakes Branch, Accessories Division, at Wright-Patterson AFB, which had the responsibility for having the necessary B-52 wheels modified so as to be available for use in the testing that would later take place of the wheel mover Con Diesel was then under contract to manufacture for the Air Force, confirmed to Mr. Gregory information previously given him on October 24, that six copies of Con Diesel drawing X-3581 and special instructions applicable thereto were needed in order to accomplish the modification.
56. By letter dated November 4, 1958, plaintiff wrote the Project Engineer, Mr. Gregory, as follows:
Dear Mr. Gregory:
In accordance with your request through our Dayton representative, Mr. Allen Brown, please find enclosed six (6) copies of Wheel Modification B-52 (Bendix) our drawing number 2101-0032.
If you need any further information, feel free to contact either Mr. Brown or the writer directly.
57. The drawing enclosed in the foregoing letter, Con Diesel No. 2101-0032, did not contain the previously stated or any other restrictive legend or statement placing any limitation on its use, as did drawing X-3581. It additionally differs from drawing X-3581 in that it contains less graphic material, portions of X-3581 being omitted.
Drawing 2101-0032 contains two depictions. One is a reproduction of a drawing of the Bendix Corporation, Bendix number 149328, which is a cross-section of the rim portion of the B-52 aircraft wheel. To this depiction, Con Diesel has added a depiction of the bolting of a ring gear to the wheel. The other depiction is a drawing of one-fourth of the face of the aircraft wheel. This shows, from this viewing point, the bolting of the ring gear to the aircraft wheel; that is, as it appears on a face view.
*39958. By memorandum dated November 6,1958, Mr. Gregory forwarded the six copies of Con Diesel drawing 2101-0032 to Mr. Kimball for use in accomplishing the wheel modification. The memorandum states that this drawing replaces Con Diesel drawing X-3581 and that the latter should be deleted from all consideration in this matter.
59. By TWX (a message transmitted by the sender over leased wire directly to the premises of the recipient) of November 11,1958, plaintiff advised Mr. Kimball that, as requested through Mr. Allen D. Brown, then plaintiff’s representative at Wright-Patterson AFB, “we have no objection to your proceeding to modify aircraft wheels in accordance with the requirements of our drawing 2101-0032.”
60. On November 13,1958, the defendant noted on the copy of said TWX through the signature of Lt. Colonel Dykman, MCJP, that “ [t]his TWX is considered sufficient written authority from Consolidated to permit the use of its dwgs. [drawings] concerned as intended, namely, for Bendix to modify wheels in accordance therewith.”
61. On November 13, 1958, Mr. Kimball’s office requested Bendix to submit a quotation for the proposed modification of the B-52 wheels, and forwarded to Bendix a copy of Con Diesel drawing 2101-0032. The request was given to the Bendix representative at Wright-Patterson AFB, Mr. D. DeLeury, that same date.
62. The cross-section depiction of the aircraft wheel on Con Diesel drawing 2101-0032 which was sent to Bendix makes reference to Con Diesel drawing 2101-0030 in connection with the depiction of the bolting of the ring gear to the wheel. By memorandum dated November 14, 1958, Mr. Gregory was advised by Mr. Kimball’s office that Bendix had notified it that, in addition to drawing 2101-0032, it also needed the said drawing 2101-0030 in order to submit its quotation for the modification work.
The memorandum further requested that a statement be obtained from the plaintiff, such as was previously obtained concerning plaintiff’s drawing 2101-0032, which grants to the defendant and Bendix the right to use the drawing in conjunction with the program for modification of the B-52 wheels.
*40063. By TWX on the same day, November 14, 19,58, plaintiff advised Mr. Kimball as follows: “Per yonr request we have no objection to yonr using our print 2101-0030 for procurement action you contemplate in connection with contract AF 33-600-38249. Mr. Brown will hand deliver this to you.”
64. By letter dated November 24,1958 (PX-11A), plaintiff forwarded direct to Bendix two copies of Con Diesel drawing 2101-0030.
65. By letter dated December 8, 1958, Bendix advised the Air Force that the price for furnishing the Bendix wheel, modified in accordance with Con Diesel drawings 2101-0032 and 2101-0030 (with the ring gear itself to be furnished to Bendix) would be $1,300.56 each. As to delivery schedule, one modified wheel would be furnished within 30 days after receipt of a contract. Other related work and items on which the Air Force had also requested quotations required additional time.
Permission by Plaintiff for the Government’s Use of Its Ring-Gear Drawings in MIL-W-27199
66. As previously noted (finding 52, supra), during the period of approximately November 1958 to May 1959, Mr. Gregory and his associates were in the process of preparing a specification that could be used for production procurement, if desired by the Strategic Air Command, upon completion of the tests which were to take place in January or February of 1959.
In about January or February 1959, Mr. Gregory, following his custom when he wanted to publish the drawings of a private company, sought and obtained from plaintiff its permission to use the Con Diesel ring gear drawings (Con Diesel drawings Nos. 2101-0032 and 2101-0030) in connection with, and as a part of, the specification, MIL-W-27199, then being prepared. He asked permission through Mr. Allen D. Brown, local representative of plaintiff at Wright Field, who conveyed the request to Con Diesel management, specifically Jerome T. Davis or Gerald Rosenberg, both officers of plaintiff, and, after receiving authorization from one of the named officers, conveyed plaintiff’s permission to Mr. Gregory. The drawings that were subsequently *401used pursuant to this permission, including the one cited in the specification that was ultimately promulgated in May 1959, are discussed in finding 110, infra.
Completion and Delivery in March 1959 of the Wheel Mover Under Contract 38249
67. Meanwhile, delivery of the wheel mover by Con Diesel was due, under contract No. 38249, on January 19, 1959. In spite of the contractor’s progress reports indicating progress was being made, delivery had not taken place, for a variety of reasons.
68. By letter dated January 28, 1959, Mr. Kimball wrote Bendix that planned procurement of modified B-52 aircraft wheels from it was thereby cancelled, due to a change in the method of obtaining them, and requested Bendix to return Con Diesel drawings 2101-0032 and 2101-0030.
69. On February 5, 1959, the buyer for the instant contract (No. 38249), Lt. Lasselle, dispatched a teletype message to the administrative contracting officer in New York, N.Y., requesting his cooperation and assistance in getting Con Diesel to complete the wheel mover as promptly as possible. The message also makes reference to a letter from plaintiff dated January 29, 1959, Subject: Contract Delivery Extension, and advises that no action would be taken by the procurement officials at Wright-Patterson AFB until receipt of the recommendation of the administrative contracting officer.
70. By letter dated February 12, 1959, plaintiff wrote the Air Force regarding several changes it proposed to make.
71. By letter dated February 13, 1959, Bendix returned to the Air Force Con Diesel drawings 2101-0032 and 2101-0030.
72. During February, 1959, several exchanges of messages within the Air Force emphasized the concern of its officials with the delay in delivery of the wheel mover units then on order, which had been scheduled for delivery in January, 1959. They again pointed out that time was of the essence, inasmuch as the Air Force needed to place production contracts and have such units available for operational use during the upcoming winter of 1959-1960.
*402During approximately the same period of time, Mr. Gregory bad various conversations with plaintiff’s representatives about tbe delivery schedule for the wheel mover, in an attempt to ascertain why the delivery schedule was not being met and, toward the end of February, 1959, made a trip to plaintiff’s plant to obtain direct knowledge of the reasons for plaintiff’s lack of progress. Further follow-up conversation with plaintiff’s representatives also took place the following month.
73. On or about February 27, 1959, plaintiff’s time for delivery was extended to March 16, 1959. This was formalized by an amendment to the contract, dated March 3, 1959 (Supp. A. No. 1, Contract AF 33 (600)-38249).
74. By letter dated March 6,1959, the Air Force returned to plaintiff its drawings Nos. 2101-0032 and 2101-0030.
75. By telegram of March 18, 1959, plaintiff requested a waiver of what was known as the Type HI mobility requirement of the applicable mobility specification, MIL-M-8090, which was incorporated by reference in the overall specification applicable to the contract, Research and Development Exhibit WCLEG-58-48, dated June 20,1958. In making its request it stated that it wanted to call to the attention of the Air Force that the unit being produced under this contract (No. AF 33 (600)-38249) was being developed under a Research and Development Program.
76. By telegram on or about March 20, 1959, plaintiff acknowledged receipt of the Government’s letter dated March 15,1959, requiring that plaintiff show cause why contract No. 38249 should not be cancelled for failure to make delivery. The show cause letter was issued because the March 16, 1959 delivery date was approaching and it appeared questionable as to whether plaintiff was going to meet that deadline.
77. Preliminary tests and inspection of plaintiff’s wheel mover were performed at plaintiff’s plant, as provided for in the contract and the unit was accepted on March 25,1959, at which time title to it passed to the Government.
It was thereupon shipped to Loring Air Force Base, Maine, for further testing, as provided for in the contract.
*403The Second Tests at Loring, March 1959; Plaintiff’s Distribution of a Brochure on its Wheel Mover
78. Tests were conducted March 27, 1959 at Loring Air Force Base on both the plaintiff’s unit and one procured simultaneously from The American Coleman Company.
79. Approximately 75 persons were present at these tests, including many Air Force officers not connected with the procurement who, upon the conclusion of the tests, would leave that air base and Would go to numerous other unknown locations. At the tests, plaintiff distributed a 10-page, 8y2 inch by 11 inch brochure about its unit, illustrated with drawings and photographs, entitled “Con Diesel B-52 Wheel Mover Demonstration Loring AFB1959.” This brochure was freely distributed to those present without restriction. The brochure itself contained no statement or other indication of any intended restriction on the data contained therein, or that plaintiff considered such information proprietary. It was being handed out to those in attendance and copies were received by many persons, including Mr. Gregory.
80. The brochure describes the basic concepts involved in plaintiff’s wheel mover, and it includes photographs, both front and rear, of the wheel driving unit with the ring'gear, which attaches to the aircraft wheel and moves the aircraft by the application of torque through this ring gear. These are photographs of the ring gear which plaintiff in this suit claims is a proprietary feature.
Also set forth is an engineering-type drawing, showing a cross-section depiction of the aircraft wheel; the bolting of the wheel ring (gear) to the wheel; and, immediately opposite that wheel and ring, the driving ring of the wheel mover unit itself, which meshes into the ring (gear) of the aircraft wheel.
The portion of the foregoing which depicts the bolting of the ring (gear) to the aircraft wheel is substantially identical with the comparable cross-section drawing on each of the following: (a) Con Diesel drawing X-3581; (b) Con Diesel drawing 2101-0032; and (c) Air Force drawings 59D6253 and 59D6255.
Likewise shown is a photograph and explanation of the *404electrical remote control box, used for controlling the wheel mover. The proposal plaintiff submitted for this contract (No. 38249) included a depiction of a remote control box strikingly comparable to the box appearing in the photograph in the brochure.
Another feature of the brochure was !a large two-page drawing (11 inches by 17 inches) showing the wheel mover units attached to the wheels of a B-52 aircraft. This drawing is a complete depiction of the unit except for the power vehicle itself; in other words, the depiction begins, at the left side of the page, with the satelliting linkage arms, which are attached to the vehicle, and, continuing to the right, shows the complete wheel moving units, in detail, in the position they occupy when attached to a pair of aircraft wheels.
In addition to the drawing itself, there is a transparent overlay, designating various elements of the units by a series of lines, arrows and numbers. A written legend, consisting of eight paragraphs, A through H, explain, by reference to the aforesaid numbers, the step-by-step order of application of the wheel movers to the wheels of the aircraft.
The last illustration in the brochure is a depiction of the power vehicle complete with the satelliting linkage arms and the wheel mover units at the end of the linkage arms, attached to the aircraft wheels.
81. Neither of the two units tested, i.e., one produced by Con Diesel and one by The American Coleman Company, met the requirements of the specification, E and D Exhibit WCLEG-58-48; neither was considered by the Air Force to be an operational vehicle.
The deficiencies in plaintiff’s unit, considered major by the Air Force, were as follows:
a. Excessive coupling and uncoupling times which required 30 and 25 minutes respectively, under adverse weather conditions.
b. The long flexible rubber hoses used for piping hydraulic fluid were difficult to handle and would be susceptible to damage during field use.
c. The “wheel mover” power supply vehicle was unable to negotiate maintenance docks incorporating “fixed” maintenance stands.
*40582. In view of these deficiencies, plaintiff was notified that its wheel mover did not meet the requirements of the specifications ; plaintiff agreed that it did not, and arrangements were made to return the vehicle to plaintiff’s plant on or about April 15,1959.
It was so returned and reworked by plaintiff for the purpose of correcting the deficiencies. (As will appear below, it was later subjected to additional tests called for by the specifications; some deficiencies were corrected, but the tests revealed additional deficiencies which were not corrected, as the unit was not considered by the Air Force as acceptable for quantity procurement (findings 90,106, infra).
The Government’s Decision to Procure Further Units with Alternative Hook-up Methods
83. On April 17, 1959, a meeting was held of representatives of various elements of the Air Force sharing in the responsibility for the obtaining for the Air Force of a satisfactory wheel mover for the B-52’s. The purpose of the meeting was to decide upon a course of action for the procurement of such a wheel mover. None of the wheel movers produced to that date had met the operational requirements of the Air Force, which was for equipment that would move B-52 aircraft over surfaces covered with snow and ice. At the meeting it was decided to prepare new specifications and to institute another development program. The reason for a new development program was that there were still a number of unresolved elements, one of which was that there had been no operational approval given to the use of a modified B-52 wheel in accomplishing the objective. It was planned that this procurement would, therefore, combine both a development and a production phase, as it was contemplated buying a quantity of the units upon completion and testing of the unit developed under the development phase of the contract. There was to be a full-scale model and a prototype designed and fabricated, which would be subject to testing. Upon successfully meeting the requirements for the unit, a production (quantity) contract was to be let.
It was also contemplated that there would be alternative *406methods of “hook-up”, i.e., of attaching the wheel mover unit to the aircraft wheel. The specification to be used for the procurement initially provided for hook-up by (1) use of the ring gear method, which required modification of the aircraft wheel, or by (2) replacing the studs, which held the wheel on the aircraft, with a modified stud, to which the wheel mover could be attached. Later, the specification was revised and, after that, there was a further revision, so that the contract that was ultimately let (AF-33 (600)-40112, considered more fully in subsequent findings) called for additional alternative methods of hook-up.
84» By teletype message on or about April 23, 1959, the Air Materiel Command at Wright-Patterson AFB advised the Air Force representative at the Boeing plant in Wichita, Kansas, of the B-52 wheel mover need and requested him to request Boeing to submit its proposal on quantities of 36 and 99 wheel movers that would meet the Air Force requirement for equipment that would give positive control and movement of B-52 aircraft over surfaces covered with snow and ice. The message stated that since the wheel movers were desired prior to the winter of 1960-61, it would be advisable for Boeing to utilize the knowledge acquired in previous wheel mover “exercises”. It further noted that drafts of a detail performance specification and statement of work would be submitted to the contractor for review on or about April 27,1959, and that the target date for a finalized specification was May 29, 1959. It additionally stated that, since the specification “will be based upon the positive drive principle, modification to the B-52 wheel will probably be necessary” and that any such modification would require a complete test. (Thereafter, on June 23, 1959, Wright-Patterson AFB was advised by its representative at Boeing that Boeing “has returned all wheel mover proposals, including Con Diesel, to the bidders unopened,” indicating that a Con Diesel proposal, apparently solicited by Boeing, was not opened.)
85. By letter dated May 5, 1959, the Air Force wrote the plaintiff as follows:
Consolidated Diesel Electric Corp.
Ludlow and Canal Streets
Stamford, Connecticut
*407Subject: Contract AF33(600)-38249
Gentlemen:
The following major deficiencies were found in the Consolidated Diesel “wheel mover unit” during recent tests conducted by Wright Air Development .Center
a. Excessive coupling and uncoupling times which required 25 to 30 minutes for each operation under adverse weather conditions.
b. Long flexible hydraulic hoses are difficult to handle and susceptible to damage during field use.
c. Vehicle was unable to negotiate maintenance docks incorporating “fixed” stands.
This Center is aware of CDEC’s agreement to meet the requirements of Exhibit WCLEG-58-48, dated 20 Juné 1958. However, insufficient information was shown on the artist’s concept sketches to evaluate correction of the above deficiencies. Therefore, it is requested that CDEC submit to this Center sufficient detailed drawing (s) and/or narrative descriptions covering proposed changes to permit a thorough evaluation regarding same.
Advise this Center if additional clarification is required to fulfill the above requirement.
Very truly yours,
/s/ Myrle A. Gearing,
Myrle A. Gearotg, Chief,
Production Pla/rming <& Materials Section,
Research <& Development Branch, Specialized Procurement Division.
86. By letters dated May 19,1959, and May 22,1959, plaintiff wrote the Air Force in reply to the latter’s letter of May 5, 1959. Plaintiff explained, inter Mia, that the matter of moving the B-52 aircraft into a maintenance dock by use of the wheel mover required that the system be attached to the rear landing wheels. It was further stated that, subject to the foregoing explanation regarding docking, “CDEC herewith agrees with you that the corrective action indicated in the referenced communication [i.e., the Air Force’s letter of May 5, 1959, set out in the foregoing finding] is necessary and proper under the terms of the contract.”
RFP 5000 of June 15, 1959, and Attached MIL-W-27199
87. The Air Force proceeded with its plan (finding 83, supra) for a single procurement of a wheel mover that would *408meet its operational requirements, in, however, two separate phases — a research and development phase (necessary because the Air Force still did not have a wheel mover which met its operational requirements), followed by a production phase. The two phases were incorporated into the request for proposals that was issued, dated June 15,1959.
88. Reflecting the two-phase plan, the request for proposals, RFP 33-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, dated June 15, 1959, called for (a) a full-scale mock-up, (b) a prototype, (c) testing of the prototype, and (d) quantity production of the unit so developed and tested. The RFP provided for the submission of proposals by July 16, 1959, and allowed the Government 60 days in which to accept.
The RFP provided, in part, as follows:
Part I — Articles and/or Data To Be Furnished
1. Mock-up, Full-scale, 1 each. Vehicle, Aircraft Propelling, Hydraulic, Wheel Torque Unit, Type A/S48A-1 in accordance with MIL-W-27199(USAF) dated 15 May 1959 incorporated herein by reference, as amended and/or supplemented by Attachment “A” thereto.
2. Accomplish an aircraft 1 lot. wheel modification and test program required to finalize an acceptable positive drive attachment for installation on the B-52 aircraft wheels. The complete wheel qualification test program shall . be accomplished by using industries facilities. (No Government test facilities will be made available for this test.)
*4093. Proto-type conforming to 1 each. the general arrangement of Item 1 and in accordance with MIL-W-27199 (USAF) dated 15 May 1959 incorporated herein by reference, as amended by Attachment “A” thereto.
4. Testing of the proto-type 1 lot. vehicle fabricated under Item 3 in accordance with MIL-W-27199 (USAF) dated 15 May 1959. (Note: Government test facilities will not be made available for required tests. Contractor is required to perform all testing as required by MIL-W-27199 (USAF)).
5. Preproduction Test Re- 1 lot. port for Item 4 in accordance with Paragraph 4.6.2 of MIL-W-27199 (USAF).
6. Vehicle, Aircraft Propelling, Hydraulic, Wheel Drive Unit, Type A/ S48A-1 in accordance with MIL-W-27199 (USAF) as amended and as approved under Item 3 herein.
(Production Models).
Lot A- 30-60 each_N/A.
Lot B- 60-90 each_N/A.
Lot C_ 90-120 each... N/A.
Proposers are required to establish unit prices for Lot A, Lot B and Lot C above. Failure to' comply may render the proposal non-responsive.
*410The Government reserves the right to award any unit within Lot A, Lot B, or Lot C and/or none of the above unit Lots.
7. Special Tools and Test 1 lot. Equipment for Item 6 above in accordance with MCP Form 71-650 incorporated herein by reference.
8. Spare Parts for Item 6 1 lot-in accordance with MCP Form 71-673 incorporated herein by reference. N/A.1
9. Maintenance Data for 1 lot. Item 3 in accordance with MCMSP Exhibit No. 1-13, attached hereto and made a part hereof.
10. Engineering Data for 1 lot. Item 3 in accordance with Table 253, attached hereto and made a part hereof.
11. Photographs of Item 3 in 1 lot. accordance with MPM Exhibit No. 1(a), attached hereto and made a part hereof.
12. Progress Reports for 1 lot. Items 1, 2, 3 & 4 in accordance with WCLEO 58-1, at-attached hereto and made a part hereof.
Past V — Testing
(a) Immediately upon receipt of the contract award, the Contractor shall proceed to design and fabricate Items 1 and 3; also he shall proceed with the study and design of the aircraft wheel modification required for the Proto-type unit.
*411(b) The fully modified aircraft wheels shall be tested for qualification purposes in accordance with AF Drawing No. 853J915, Revision “B”. In addition, the normal torque plus 20% required to rotate the aircraft wheels and move the aircraft per Paragraph 3.6.3.1.1 of Specification MIL-W-27199 (TJSAF) shall be applied to the wheel not less than 100 times during roll test without detrimental effects. Wheel test and evaluation program shall encompass the feasibility of using the positive drive methods listed below as well as any proposed by the Contractor (s).
(1) Wheel modified in accordance with AF Drawing Nos. 59D6253,6254 and 6255.
(2) Application of torque through modified wheel studs (wheel studs refer to bolts and nuts used to secure wheel rim halves).
89. The specification applicable to RFP 50.00, MIL-W-27199, as amended, which was incorporated into the procurement by reference (RFP 5000, Part I, finding 88, supra), provided, in pertinent part, in paragraph 3.5.4, as amended, as follows:
Drive torque required to rotate the aircraft wheels for movement purposes shall be determined through the test program specified by the procuring activity. Ring gear shown on Drawing 59D6253 shall form a part of the test program.
MIL-W-27155 is the specification which, as noted in prior findings, Mr. Gregory and his associates had been hi the process of preparing since the latter part of 1958. Its pertinent portions will be discussed in detail below.
As of the time of the issuance of this specification, June 1959, the Government had not bought engineering drawings from the plaintiff nor purchased any of its alleged proprietary rights.
90. On June 17, 1959, plaintiff’s wheel mover (which had been procured by the Air Force under contract No. 38249) was tested at Westover Air Force Base, Massachusetts, in connection with deficiencies previously revealed by the tests at Loring AFB on March 27, 1959 (findings 78, 81, supra). It met the requirements of the specifications with respect to the coupling and uncoupling time and use of an acceptable *412piping arrangement for hydraulic system components. It was then shipped to Wright-Patterson AFB for final tests, as provided for in the specifications. (As is shown in finding 106, infra, the unit did. not meet these tests.)
91. The mentioned dual-phase procurement plan (finding 87 swpm) was formalized and approved in a “Procurement Plan”, dated June 22, 1959, which set forth the plan in detail. The tentative time table provided for carrying out the plan included the following: opening of proposals on July 16, 1959; technical evaluation by July 27, 1959; letter contract by August 7,1959, definitive contract by September 15, 1959; delivery of the prototype by January 7,1960; completion of testing by April 7,1960; and delivery of the first production unit by August 1,1960.
92. A meeting of Air Force representatives was held in early July, 1959, including both procurement and technical personnel and representatives of the Strategic Air Command, the potential user of the wheel mover. Since there was no unit then available, including the one recently procured from Con Diesel, which met the operational requirements of the Strategic Air Command, a firm decision was made to proceed as previously planned, namely, to produce a prototype unit, test for operational suitability and, based upon test conclusions, go into production.
Plaintiff’s Protest That MIL-W-27199 Disclosed Its Secrets and Its Claim to be a Sole Source for RFP 5000
93. By letter dated July 10,1959, to the Contracting Officer at Wright-Patterson AFB (and thereafter to higher authority), plaintiff protested the proposed procurement under RFP 33-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 as disclosing its alleged proprietary data. Plaintiff alleged violation by the Air Force of its position regarding such data and contended that the procurement should be from it as a sole source procurement.
94. By letter of transmittal, dated July 15, 1959, Air Logistics Corporation forwarded to the Air Force its proposal, dated July 14,1959.
Plaintiff’s proposal (not in evidence) was apparently submitted on or about the same date.
The provisions of the request for proposals and the appli*413cable specifications (Part V(b), finding 88, supra) permitted bidders to propose positive drive methods for rotating the aircraft wheels other than the ring-gear method. Air Logistics’ proposal contained two alternative methods, a flange fitting method and a rim lug method. Neither method involved the use of a ring gear.
95. By letter dated July 23, 1959, plaintiff wrote the Air Force regarding the modifications it had made in the unit purchased under contract No. 38249 in order to reduce the coupling and uncoupling times so as to meet the five-minute design objective specified in the specifications, R and D Exhibit WCLEG-58-48. It further stated that the modifications reduced the time to less than the five-minute objective; photographs showing the modifications were attached.
Competition Between Plaintiff and Air Logistics; Award of the Contract to Air Logistics
96. At approximately the end of August or early September 1959, Mr. Gregory and his associates, including Air Force procurement personnel, held separate meetings with representatives of both Con Diesel and Air Logistics for the purpose of negotiating a contract on the basis of RFP 5000.
97. Plaintiff’s bid price was $149,884 for the prototype and $58,249 each for a quantity of 30 to 60 unite. Air Logistics’ price was $136,595 for the prototype and $40,824.50 each for the 30 to 60 units. Plaintiff’s bid was, therefore, $13,289 higher on the prototype. On the basis of 35 production unite (the quantity for which a contract subsequently was let), its price was $2,038,715 ($58,249X35) as compared to Air Logistics’price of $1,428,851.50 ($40,824.50 X 35) or $609,858 higher on the basis of the 35 imite only, exclusive of the prototype. On the basis of the comparative price of the 35 productions plus the prototype, Con Diesel’s price was $623,053 higher than Air Logistics’ price. (Con Diesel: $2,038,715 for 35 unite plus $149,884 for the prototype equals $2,188,599; Air Logistics: $1,428,851 plus $136,595 for the prototype equals $1,565,546. The difference is $623,053.)
In the course of the mentioned negotiations with the two companies, plaintiff reduced its price so that this difference *414was reduced to approximately $190,000 on the basis of a total procurement of approximately $1,700,000.
98. Both plaintiff and Air Logistics were companies with extensive experience in the wheel mover field. Plaintiff had previously built two wheel movers for the Government under two separate contracts, as shown in prior findings. Under these two contracts, it was paid by the Air Force a total of $280,942 ($98,000 under contract No. 36520 and $182,942 under contract No. 38349). It claimed administratively to have spent approximately $250,000 since 1956 in the development of its wheel movers.
Air Logistics also represented administratively that it had expended approximately $250,000 in development costs in producing its commercial design for a wheel mover. It began its wheel mover activities in approximately 1956, working extensively with commercial lines in attempting to develop a wheel mover for commercial use.
As previously shown, up to this time (September 1959), no one, including both plaintiff and Air Logistics, had developed a wheel mover which was operationally acceptable to the Air Force.
99. Following negotiations with both companies, the Air Force on September 4, 1959 entered into a letter contract with Air Logistics Corporation for 36 wheel movers for B-52’s. In due course, the letter contract was superseded by a definitive contract.
100. Luring September 1959, plaintiff continued its protest, orally and in writing, of the award of a contract to Air Logistics Corporation.
The Five Hook-up Methods Proposed by Air Logistics
101. Under its letter contract, Air Logistics was responsible for submitting at least three alternate methods, in addition to the (two) methods set forth in its proposal, for attaching the wheel drive unit to the wheel of the aircraft. Pursuant to this requirement, Air Logistics submitted a total of five proposed methods.
102. The responsible Air Force officials, including representatives of the Aircraft Laboratory, which had responsibility for the complete aircraft frame, and the Strategic *415Air Command, -winch was the using organization, strongly objected to any method (of attachment to the aircraft) which required modification of the aircraft wheels; they did not want the wheels modified unless absolutely necessary.
103. On September 29, 1959, a conference was held at Wright-Patterson AFB for the purpose of reviewing and considering the Air Logistics Corporation proposed methods of attachment of the wheel drive unit (of the wheel mover) to the B-52’s wheel. In attendance were representatives of various components of the Air Force, as well as of Bendix Aviation Corporation, the wheel manufacturer, and Air Logistics. The five different proposals for direct drive methods of attachment to the aircraft wheels which Air Logistics had submitted were explained in detail by Mr. Morrie Harper, its Chief Engineer, who testified on the trial of this case. None of the proposals utilized the ring-gear concept. After a discussion of all five proposals, the conferees agreed that the following three were the most acceptable from the technical, maintenance, operation and overall Air Force viewpoints:

Air Logistics Corporation’s Proposal drawing number designation General description

107756 C Friction shoes expanded against under side of rim by hydraulic cylinders.
107757 D Expander tube similar to Fawick expander clutch. Expanded by air or hydraulic
107758 E pressure. Positive drive through hollow headed bolts installed in rim flange.
It was decided at the meeting that Air Logistics should proceed immediately with proposal “C”, since Bendix representatives advised that that method would require certain testing and that proposal “D” would be acceptable without tests if proposal “C” successfully passed tests to which it would be subjected. It was also agreed that method “D” was *416the most desirable for use and would be used if tests proved satisfactory.
The Definitive Contract With Air Logistics
104. The definitive contract with Air Logistics Corporation which superseded the letter contract and carried the same number, AF 83 (600)-40112, was effective October 20, 1959. It was signed by Air Logistics Corporation on November 11,1959; by the contracting officer December 8,1959; and was formally approved by the Director of Procurement and Production on December 14,1959.
105. The said definitive contract contained, inter alia, the following provisions:
Part I — Supplies To Be Furnished
The Contractor shall furnish and deliver to the Government the following articles, data and reports at the unit and total prices as set forth below:
Item 1. — Mock-up, Full-scale, Vehicle, Aircraft Propelling, Hydraulic, Wheel Torque Unit, Type A/S48A-l,in accordance with Specification MIL-W-27199 (USAF), dated 15 May 1959, incorporated herein by reference, as amended by Attachment “A”, attached hereto and hereby made a part hereof, at a total price of_ $16,755.00
Item 2. — Accomplish three (3) different methods of aircraft wheel modifications and conduct the test programs required to finalize an acceptable drive attachment for installation on B-52 aircraft wheels. The complete wheel qualification test program on the aircraft wheel modifications shall be accomplished by using industrial facilities. (No Government test facilities will be made available for this test.) Total price_ 31,950.00
*417Item 3. — One (1) Prototype Vehicle conforming to the approved general arrangement of Item 1 and in accordance with said specification MIL-W-27199, as amended, at a total price of-$136, 595. 00
Item 4: — Test the prototype vehicle fabricated under Item 3 in accordance with said Specification MIL-W-27199, as amended. (No Government test facilities will be made available for these tests.) Total price_ 15,704.00
Item 6. — Preproduction Test Keport for Item 4 in accordance with Paragraph 4.6.2 of said Specification MÍL-W-27199, as amended, at a total price of_ 604.00
Item 6. — Thirty-five (35) Vehicles, Aircraft Propelling, Hydraulic, Wheel Torque Unit, Type A/S48A-1, in accordance with said Specification MIL-W-27199, as amended, and in accordance with the prototype approved under Item 3 above, at a unit price of $40,824.50 and at a total price of_ ,428,857.50
Item 7. — Special Tools and Test Equipment for Items 3 and 6 above in accordance with Ground Support Equipment and Spare Parts Therefor Provisioning Document, MOP 71-650, dated Mar 59, and Amendment No. 1 thereto, dated July 1959, both of which are incorporated herein by reference. There is committed for this Item the sum of_ 28,577.00
Item 8. — Spare Parts for Items 3 and 6 above m accordance with Spare Parts Provisioning Document, MCP 71-673, dated January 1959, and Amendment No. 1 thereto, dated March 1959, both of which are incorporated herein by reference. There is committed for this Item the sum of_ 285,770.00
*418Item 9. — Maintenance Data for items 3 and 6 in accordance with. MCMSP Exhibit No. 1-13, attached hereto and hereby made a part hereof, at a total price of-$21,704.00
Item 10. — Engineering Data for Items 3 and 6 in accordance with Table 253, dated January 1958, attached hereto and hereby made a part hereof, at a total price of-59,461. 00
Item 11. — Photographs of Items 3 ■and 6 in accordance with MPM Exhibit No. 1 (a), attached hereto and hereby made a part hereof, at a total price of_ 94.00
Item 12. — Progress Eeports for Items 1, 2, 3 and 4 in accordance with paragraph 1 of Exhibit WCLEG 58-1, dated 6 February 1958, attached hereto and hereby made a part hereof, at a total price of_ 3,035.00
Item IS. — Engineering changes for Item 3 shall be submitted in accordance with AWA Bulletin 391(a), incorporated herein by reference. Engineering changes resulting from this Item shall include the price of all applicable revisions to Data. There is committed for this Item the sum of_ 25,000. 00
PART II — GOVERNMENT FtJRNISHED PROPERTY
The Government shall furnish the following equipment to the Contractor for use in connection with the performance of this contract, subject to the provisions of Clauses 24 and 29 of the General Provisions:
(a) One (1) complete forward right and left landing gear installation for a B-52 aircraft, including 4 wheel and brake assemblies and related hardware.
(b) One (1) complete set of drawings covering the above landing gear installation.
(c) One (1) assembly drawing outlining the present B-52 aircraft tow bar.
*419Part III — Responsibility for Desigk and PERFORMANCE
The Contractor hereby assumes full responsibility for the design, fabrication, testing and performance required on the articles supplied herein,* in accordance with the approved proposal as submitted under RFP 33-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 and Amendment No. 1 thereto, incorporated hereby by reference.
Part IV — Testing
(a) The fully modified aircraft wheels shall be tested for qualification purposes in accordance with AF Drawing No. S58J525. In addition, the normal torque plus 20% required to rotate the aircraft wheels and move the aircraft per Paragraph 3.6.3.1.1 of Specification MIL-W-27199 (TJSAF), as amended, shall be applied to the wheel not less than 100 times during roll test without detrimental effects. The wheel test and evaluation program shall encompass the feasibility of using the drive methods listed below as well as any proposed by the Contractor.

Contractor’s Proposal drawing number designation General description

(1)107756_C (2)107757_D (3)107758_E Friction shoes expanded against under side of rim by hydraulic cylinders. Expander tube similar to Fawick expander clutch. Expanded by air or hydraulic pressure.Positive drive through hollow headed bolts
installed in rim flange.
* * *
* * *
* * *
Part "V — Delivery Schedule
Items 1 and 8. — To be completed on or by 3 November 1959.
Item 3. — To be completed by 2 March 1960.
*420Item ¿. — Within ninety (90) days after completion of Item 3 herein.
Item 5. — Within ten (10) days after completion of Item 4 herein.
Item 6. — 5 each units by 15 August 1960; 10 each additional units by 15 September 1960; 10 each additional units by 15 October 1960; 11 each additional units by 1 November 1960.
The Contractor shall not procure any materials or supplies until authorized in writing by the Procuring Contracting Officer. It is contemplated that long lead time items will be related within 45 days after initiating of Item 4.
Note : The eleventh unit of the last production quantity stipulated for 1 November 1960 delivery is the refurnished prototype.
Items 7, 8 & 9. — Concurrently with units specified mider Item 6 herein.
Items 10 & 11. — Within thirty (30) days after Contractor’s receipt of written approval of Item 3 herein, anything specified to the contrary in Table 253 notwithstanding.
Item 1/2. — Within fifteen (15) days after the end of the period to which each report applies (Note : This report is required for the duration of Items 1, 2, 3 and 4 only).
106. Between September 17, 1950 and December 14, 1959, the final functional tests of the wheel mover which plaintiff had manufactured for the Air Force under contract No. 38249 (title to which passed to the Air Force in March 1959) (finding 77, supra) were conducted at Wright-Patterson AFB. These tests were dimensions and weightcheck tests, mechanical inspection tests and road tests. Over 21 “discrepancies,” i.e., deficiencies, were noted. Corrective action was not considered warranted since quantity procurement of the item was not contemplated. The wheel mover was not considered by the Air Force as acceptable for meeting the requirements of the specification, K and D Exhibit WCLEG-58-48, dated June 20,1958.
107. The Air Logistics contract called for completion of the prototype by March 2,1960 (Part V, finding 105, supra). Upon acceptance of its proposal, Air Logistics embarked upon a vigorous, aggressive program to design and fabricate the wheel mover, as was its obligation under the contract *421(Part III, finding 105, supra). It immediately took such steps as the employment of design engineers of the Yickers Hydraulics Company of Detroit, Michigan, to design the hydraulic system; it hired gear consultants to design the gear box; and it assigned one of its engineers to design, with the help of others, the electrical system. A total of approximately 25 design engineers, draftsmen and related personnel were involved in developing the Air Logistics design. The applicable specification, MIL-W-27199, gave Air Logistics a general guide as to the requirements for the wheel mover, but it did not disclose any detailed engineering data.
108. Beginning in 1956 and continuing through approximately 1961, Air Logistics was active in the wheel-mover field. It did a great deal of work in connection with developing a wheel mover for commercial airlines, its representatives, including Mr. Harper, its chief engineer, in charge of developing the unit for the Air Force, working closely with such companies as United Airlines, Swiss Airlines, and Douglas Aircraft. After spending about three years in such work, Air Logistics sold its prototype and its engineering concept to American Machine and Foundry Company. One airline used the unit, buit it did not sell.
The only sales of wheel movers have been 51 sold to the Air Force, 35 under the Air Logistics contract previously •referred to (AF 33(600)-40112) and 16 under a subsequent procurement.
The airlines have no use for wheel movers. They use ordinary tractor-type tugs for towing aircraft in and around hangars, but prefer to have the pilot taxi to and from the take-off point with the plane’s own power. Planes take off with great frequency and too many tugs would be needed to move the planes to or from the take-off position. Consequently there is no commercial airline market for wheel movers.
There is no evidence in the record that commercial airlines have at any time procured, or sought to procure, wheel movers of the type involved in this suit, i.e., those utilizing a direct drive by means of attachment to the aircraft wheels.
*422The Issue of Disclosure by MIL-W-27199 of Plaintiff’s 11 Items of Alleged Proprietary Data
109. Herein are found the facts relating to the issue of the disclosure by MIL-W-27199 of each of the 11 items of information claimed by plaintiff to be proprietary or secret.
Each of the items is discussed under four headings, as follows:
A. The Claimed Secret Information. Here is quoted plaintiff’s description of the item of information, as given in a pretrial statement filed by plaintiff June 2, 1969 (see orders of June 17, 1963 and May 27, 1969).
B. The Complained-of _ Part of Specification 27199. Here is quoted plaintiff’s statement of the portion of the specification claimed to disclose the item of information.
C. Findings on Defendant’s Source of the Information in the Specification.
D. Other Findings as to the Specification.
Item 1. Wheel Mover Units, Including Bing Gear Attachment
A. The Claimed Secret Information:
The wheel mover gear looses 'are light and of minimum size to make them readily transportable, capable of each installation and small enough to not cause interference with aircraft structure. They deliver very high torques in order to move heavy aircraft under all conditions. The gear boxes utilized such materials as magnesium and aluminum as well as high strength steels. The design was based on usage of an epicyclic train for minimum envelope thickness and concentric output. The planet carrier was of cast aluminum contrary to ordinary design methods which used steel for this member, particularly where high torques are involved. The housing was of cast magnesium instead of aluminum as normally used in lightweight practice. The result was a gear box that could deliver over 200,000 inch-pounds of torque and over 100 horsepower for only about 250 pounds.
In a Bing Gear Attachment, the characteristic problem of an epicyclic train is that of holding extremely close concentricity between the sun gear, planet centers and ring gear. Common practice is to hold all centers *423accurately, an extremely costly method, or to allow the planet carrier to float which was not practical in this application. Instead, the ring gear was attached to the case with pins in oversize holes in the gear, allowing floating engagement with the planet gears. This arrangement was unique and was effective in preventing any binding due to tolerance buildup while providing adequate attachment for reacting torque to the gear case.
B. The Oomplained-of Part of Specification 87199:
(1) Wheel Mover Including Bing Gear Attachment This feature is set forth in the portion of paragraph 3.6.1 which states “When power is not required on both sets of main landing gear front wheels, it shall be possible to completely detach one set of drive media and store the same on the prime mover.” The term “drive media” refers to the wheel mover unit. In paragraph 3.6.1.1, the statement that “Hydraulic motors and gear boxes required for drive purposes shall be of lightweight construction and easily positioned by not more than four men wearing heavy duty clothing” indicates wheel movers, since the two subparagraphs refer to hydraulic motors and gear boxes which is the required drive media.
O. Findings on Defendant's Source of the Information.
1. The quoted part of paragraph 3.6.1 was a requirement brought forward from the two earlier wheel mover research and development contracts with plaintiff. The sentence is identical in substance to a sentence in the corresponding provision in the specification issued almost a year earlier, on June 20,1958, Besearch and Development Exhibit WCLEG-58-48, for the procurement of a wheel mover from plaintiff under contract No. 38249. The Air Force considered it a desirable feature, and included it in the instant specification.
This feature was set forth also in the “Aviation Week” article of October 7,1957, which Mr. Gregory had seen.
The concept was further reflected in an earlier patent with which Mr. Gregory was familiar (U.S. Patent 2,409,552 filed May 27,1943, issued October 15,1946, note: col. 3, lines 1-7).
2. The quoted part of paragraph 3.6.1.1 incorporates a principle publicized in the “Aviation Week” article of October 7,1957. Experts at Wright-Patterson suggested hydraulic *424motors and, in addition, hydraulic power was used in the prior wheel movers purchased by the Air Force from Con Diesel.
D. Other Findings as to the Specification.
1. The quoted part of paragraph 3.6.1 does not contain any detail design information. It sets forth end requirements but does not require a specific solution.
2. The quoted part of paragraph 3.6.1.1 does not disclose to a prospective bidder how to make the hydraulic motors and gear boxes and therefore does not disclose any detail iesign information.

Item 2. Methods of Application and Reaction of Tongue

A. The Claimed Secret Information:
It was necessary in the wheel mover concept that driving torque be applied to the aircraft wheel in a positive manner to eliminate the possibility of slippage as evidenced in prior state of the art relating to other attempts to develops a direct wheel drive. The problem was effectively solved by the Plaintiff through use of mating drive members consisting of wheel mounted female and mounted male rings having special tapered and rounded teeth with tapered entry tips to allow said mating to occur although engagement may begin with tooth opposed to tooth. Upon engagement, the drive is positive since a mechanical connection exists between the driving and driven members. The tooth form was highly unusual and unique requiring the development of new methods and techniques to produce the necessary contours.
Driving torques were usually so large that conventional methods of reaction, such as torque arms with wheels reacting to the ground, were completely impractical and unusable from a weight and size standpoint. The Plaintiff developed a unique concept whereby torque was reacted from the gear case by an A-frame whose apex was attached to a member which was especially designed to be readily engaged with a fixed portion of the aircraft landing gear. In this manner, driving torque was reacted directly back to the aircraft itself, thus resulting in no external force input requirements. This arrangement was also designed to be capable of accommodating normal movements of the aircraft strut during *425ground movement without imposing additional stresses on the torque reaction mechanism.

B.The Oomplained-of Part of Specification 27199:

(2) Application and Enaction of Torque
This feature is set forth in paragraph 3.5.4, wherein it states that “Drive torque required to rotate the aircraft wheels for movement purposes shall be applied through the ring gear shown on Drawing X59D6253,” and in paragraph 3.6.1 in the sentence “Movement of the aircraft shall be accomplished by applying torque directly to the aircraft wheels through the ring gear shown on drawing X59D6253.”

C.Findings on Defendant's Source of the Information.

The sentence from paragraph 3.5.4 specifies a concept disclosed, in words and in photographs, in the “Aviation Week” magazine article of October 7,1957, with which Mr. Gregory was familiar. In addition, Mr. Gregory had obtained the permission of Con Diesel to use its ring-gear drawings in the specification (finding 66, supra).
The sentence from paragraph 3.6.1 incorporating drawing X59D6253 of the ring gear was included as a result of the decision of the Air Force to continue with the direct drive principle. Since the B-52 wheels would have to be modified if the ring gear was to be attached to it, it would be necessary to get this modification approved so that the wheel, as modified, would qualify as part of the aircraft. Mr. Gregory and his associates knew that the information regarding the ring gear would have to be sent to any other prospective bidder, and he proposed to do this by putting the reference to the drawing in the specification. He accordingly proceeded to get Con Diesel’s permission to do so, as found above.

D.Other Findings as to the Specification.

1. The ring gear concept which plaintiff claims to be proprietary was shown by a photograph in the Con Diesel brochure which was distributed at the Loring AFB demonstration held in March 1959 (findings 79, 80, supra).
2. Paragraph 3.5.4 was amended as follows:
Paragraph 3.5.4, second sentence: Delete and substitute, Drive torque required to rotate the aircraft wheels *426for movement purposes shall be determined through the test program specified by the procuring activity. Ring gear shown on Drawing 59D6253 shall form a part of the test program.
Drawing X59D6253 and 59D6253 are essentially the same.
The ring gear concept disclosed by the specification, apart from the drawing, does not provide detail design information.

Item 3. Methods To Provide Indexing and Automatic Alignment

A. The Claimed Secret Information:
Indexing Provisions. — Since toothed rings had been selected as the best means of transmitting torque to the wheel, some form of indexing provision had to be conceived which would permit necessary rotation to mesh the rings without the associated disadvantage of a “lost motion” torque reaction and resulting shock loads. This was solved by the development of a unique, pivotally mounted member interposed between the A-frame 'ana the wheel mover gear case, which allowed limited concentric rotary motion of the gear case. The motion was established to allow indexing of the male and female drive rings when engagement was made. After engagement, the operator set a latch in position so that immediately upon application of driving torque, the gear box would rotate to the limit of its allowance and a locking pin would snap into engagement, thus locking out all lost motion in the torque reaction system and eliminating shock loads from the drive system and aircraft structure due to reversals or changes in wheel torque.
In the automatic alignment, it was necessary to meet two conditions to achieve the result contemplated by this concept:
a. The wheel mover assemblies had to be completely self-aligning to properly mate with the wheel and to insure freedom from additional stresses due to binding, twisting, etc., during operation.
b. The wheel mover assemblies had to be completely rigid when detached from the aircraft for stability reasons during transport.
Special and unique limited motion linkages, self-aligning bushings and unusual positioned pivot axis were used to supply degrees of freedom about and along the X, Y and Z axis to guarantee alignment with the aircraft wheel. Upon removal of the wheel movers from the *427aircraft, all of the freedoms could be locked out by insertion of quick release pins in appropriate locations.
B. The Complained-of Part of Specification 27199:
(3) Indexing and Automatic Alignment
This feature is disclosed in paragraph 3.5 wherein it states that “The design shall incorporate characteristics that will aid in aligning the unit with the aircraft landing gear preparatory to coupling to the. aircraft”, and in the sentence of paragraph 3.5.4 which states that “Features shall be incorporated in the applicable unit components to preclude incorrect coupling which may be detrimental to the aircraft or wheel drive unit”.
C. Findings on the Defendants Source of Information.
The sentence from paragraph 3.5 was the result of the Air Force’s experience with 'accidents and near-accidents, at northern air bases, involving standard tow-tractor combinations. The wheel mover being procured would be operating close to the aircraft so the Air Force in this provision of the specification was seeking to put the designer on notice of a serious problem.
The sentence from paragraph 3.5.4 was also the result of Air Force experience. At northern bases towing tractors had skidded on slippery surfaces, causing damage to the aircraft. The Air Force desired to have a unit which could approach the aircraft, stop and couple the wheel drive unit to the aircraft by a device that would eliminate the necessity of the whole wheel mover vehicle going right up to the aircraft.
D. Other Findings as to the Specification.
This sentence from paragraph 3.5 gave no detail design information. It was rather a general requirement requiring a complicated design concept. The forward pairs of landing gears might, for example, be at different levels, because one of them might be on a ridge of ice or snow. To meet the requirement would require a specific design. Such a design would require a number of moving parts having critical tolerances and dimensions, and also require production drawings for fabrication.
The sentence from paragraph 3.5.4 likewise pointed out a *428problem and set a requirement to be met but provided no daaign data or information with which to solve the problem.

Item I- Positioning and Attachment Devices for Wheel Mover Elevating Mechanism Including Latching ■ Provisions

A. The Claimed Secret Information:
It was necessary to provide an easy means of positioning the complete wheel mover assembly for attachment to the aircraft wheels. The assembly, consisting of two WMÜ’s and associated torque reaction linkage, weighed approximately 900 pounds and required lifting and accurate positioning to engage with the wheels. The unique, unusual and ingenious solution involved an integral “boot-strap” type screw jack so arranged that when the torque reaction system was attached to the aircraft landing gear the jack could be used to elevate, the wheel mover unit from the ground into vertical alignment with the wheel. Also, a transverse pivot in the torque reaction system was so located that the operator could easily rock the elevated wheel mover assembly about the same, to achieve horizontal alignment with the wheel. Coordination of these two motions permitted perfect co-axial positioning of the wheel mover unit for easy engagement with the wheel. This original concept made alignment of the wheel mover practical and easily accomplished.
Upon engagement of the wheel movers to the wheels, it was imperative that latching provisions be developed which would be errorproof and unaffected by extremely high driving torques. The evolved concept provided for automatic latching with manual safety locks, all controlled from the operator’s side of the WMU.
The above was accomplished through use of unique over-center latches designed to hold the driving and driven members together upon engagement. These latches were controlled through a co-axial shaft in the wheel mover unit which terminated in a handle on the opposite side of the case from the wheel. The handle could be placed in the “Unlock”, “Neutral” or “Safety Lock” position. The “Unlock” position disengaged the “WMU from the wheel, permitting removal. The “Neutral” position allowed automatic latching of the WMU to the wheel when the mating rings were engaged, similar in action to the latching of a door when it is closed. *429The “Safety Look” position guaranteed that all latches were home and that the WMU was ready for operation.
B. The Gomplained-of Part of Specification £7199:
(4) Positioning and Attachment Devices
These features are contained in paragraph 3.5 entitled “Design and Construction” wherein it states that : “The unit shall be designed for positioning under the aircraft fuselage forward of front gear when moving the aircraft in order to insure quick coupling capability and to prevent interference with the maintenance stands wnen entering and leaving docks,” elsewhere in the same paragraph directing that “The design shall incorporate characteristics that will end in aligning the unit with the aircraft landing gear preparatory to coupling the aircraft.” They are further covered in paragraph 3.5.4 which provides that “Manual lift of the unit components for coupling or uncoupling from the aircraft shall not exceed the lift requirements of 3.5.4.3. Devices that provide adequate mechanical advantage shall be used to eliminate the requirement for manual lift.”
C. Findings on Defendamos Sowroe of the Information:
The sentence from paragraph 3.5 calling for the unit to be under the aircraft fuselage was the result of Air Force experience. The Con Diesel units produced under prior contracts were positioned in front of and off to one side of the aircraft wheels. In the second test at Loring AFB, the Air Force had not been able to pull the aircraft into and out of the maintenance “docks,” which are immovable “stands” by which entrance is gained to the aircraft when on the ground. This led the Air Force to the view that the wheel mover would have to be of “low silhouette” construction so as to go under the fuselage of the aircraft itself.
The wheel mover which Con Diesel delivered to the Air Force did not have this “low silhouette” feature, also called “underbelly configuration.” Con Diesel showed the Air Force a full scale mock-up which it (Con Diesel) thought would meet the Air Force’s needs; the feature appeared in the mock-up. Mr. Gregory, the Air Force Project Engineer principally responsible for the drafting of this specification, had seen this feature on other wheel movers prior to seeing Con Diesel’s mock-up unit.
*430Tbe first-quoted sentence from paragraph 3.5.4 merely specifies an Air Force requirement as to maximum permissible lift.
The next sentence, providing for adequate mechanical advantage to eliminate mechanical lift, was one of the features publicized in the “Aviation Week” article of October 7, 1957. The Air Force did not want operation of the unit to depend on having a crew of men available to lift the equipment.
D. Other Findings as to the Specification.
The complained-of part of paragraph 3.5 provided no design information.
With respect to the complained-of part of paragraph 3.5.4, plaintiff conceded (through its witness) that the first sentence did not contain any engineering design data, and further that the next sentence, relating to devices providing adequate mechanical advantage, was a general provision and that there are many ways of providing mechanical advantage.
Item 5. Hydraulic Power Application System, Including Hydrostatic Transmission, Two Speed Design, am/1 Limited Slip Differential
A. The Claimed Secret Information:
The Plaintiff was the first to conceive and introduce high pressure hydrostatic transmissions to a propulsion system for ground movement of heavy aircraft. These transmissions as conceived and developed by Plaintiff included variable displacement over-center prunps and fixed displacement motors yielding steplessly variable speed ratio and shockless reversal of power without a clutch. Dynamic braking inherent with this design provided braking effort equivalent to maximum driving thrust.
A basic or ordinary hydrostatic transmission could not have driven a B-52 above 2*4 miles per hour without a severe weight and size penalty to the componentry. The objective, however, was for speeds up to five miles per hour. This objective was met oy providing, in addition to the basic stepless speed ratio from zero to maximum, a second higher range for speeds above the basic range. This was accomplished by “cutting out” one of two drive *431motors on each, of the WMU’s, providing a speed capacity of double the basic speed range. The circuit was so conceived that when in the high speed range, the idling motors merely circulated fluid in an independent closed loop at very low pressures, thus maintaining lubrication and essential cooling of moving parts.
In order for a wheel drive system to be completely effective, it is necessary to prevent power from being dissipated at one wheel when slippery conditions exist. A mechanical device that accomplishes this is known as a limited slip differential which is used on most military vehicles. The wheel mover system, however, was designed to drive four wheels hydrostatically and could not use such an existing system. A technique was developed by Plaintiff by wfi.cn each pair of wheels was driven by separate hydrostatic transmissions with a small interconnecting aircraft circuit between having flow control valves to limit the interchange to that required for differential action during normal maneuvering. Flow controls were also interposed in the circuit between each wheel of a pair to limit the amount of flow to each wheel. Under slippery conditions differential action was thus limited so that full pressure could be attained to drive the tires with the most traction.
B. The Oomplained-of Part of Specification 27199:
(5) Hydraulic Power Application, Multi-Speed, Multi-Pressure, Limited Slip Differential
The features are contained in the following paragraphs or portions thereof:
Paragraph 3.6.1.1 — “Power Drive,” which states that: “The wheel drive unit shall apply moving energy to the aircraft wheels by hydraulic means.”
Paragraph 3.7.1 — “Hydraulic System” — “A complete hydraulic fluid system shall be provided consisting of the components required to perform all hydraulically-powered operations of the aircraft wheel drives, external steering system for the aircraft, and the unit wheel drives. All hydraulic pumps, motors, valves, piping, et cetera, shall be suitable for use with hydraulic fluid conforming to MIL-H-5606. The system shall be designed and installed in accordance with the best commercial practices.”
Paragraph 3.7.1.3 — “Hydraulic Pumps” — “Hydraulic pumps with the necessary pressure and flow capacities to operate the hydraulically powered com*432ponents shall be provided. Pumps shall be driven by the prime mover engine specified herein.”
Paragraph 3.7.1.7 — “No-Spin Provisions” — “The hydraulic motors used for aircraft wheel drive purposes shall be constructed and assembled in a manner to incorporate automatic means for permitting differences in speed between the wheels on each landing gear while insuring adequate drive to either wheel m the event the other loses traction. No-spin provisions shall also be incorporated between wheels on each of the two landing gears when wheels on both sets of gears are being driven.”
Paragraph 3.7.2 — “Engine torque and horsepower shall be provided at governed rpm which will assure performance with an adequate margin of safety.”
C. Defendant's Sowrce of the Information.
The sentence quoted from paragraph 3.6.1.1 incorporates a principle publicized in the “Aviation Week” article of October 7, 1957. Hydraulic power was used in the prior wheel movers acquired by the Air Force from Con Diesel. The hydraulic experts at Wright-Patterson, also, suggested hydraulic power.
The source of the quoted sentence of paragraph 3.7.1 was the awareness of the Air Force representatives, prior to this time, of the hydraulic taxi drive system incorporated in the Navy HR 2S-1 Helicopters, which provided a means of taxiing the helicopter by hydraulic means. This hydraulic fluid system had been brought to the attention of Mr. Gregory and his associates with the suggestion that they look into it as a possible system for a wheel drive unit. In addition, hydraulics were used in the first and second wheel mover units fabricated by plaintiff for the Air Force, which had been tested at the first and second Loring AFB tests.
The concept of external steering, referred to in the same sentence, had been previously brought to the attention of Mr. Gregory and his associates by, inter alia, the “Aviation Week” article of October 7,1957.
The next sentence of paragraph 3.7.1, with respect to hydraulic fluid, was the result of Air Force experience. It had found that the use of its standard hydraulic fluid, MIL-H-5606, had caused corrosion deterioration when used in *433some hydraulic devices, so it was necessary to specify here that the hydraulic components used had to be suitable for use. with this hydraulic fluid.
In the first quoted sentence of paragraph 3.7.1.3 the specification was pointing out the major components of a hydraulic system and setting forth the necessary performance requirements which would result in the item embodying such components. Mr. Gregory and his associates were familiar with these features from their study of (a) the “Aviation Week” article of October 7, 1957; (b) an article in the “American Helicopter,” February 1957, entitled “The Self-Sufficient Helicopter by Hydraulics,” which described a hydraulic system for moving helicopters; and (c) the maintenance manual for the Navy HB.2S helicopter.
The second quoted sentence of paragraph 3.7.1.3 is in the nature of an expansion of the provision of paragraph 3.7.2 specifying that the hydraulic pumps are to be driven by the prime mover engine, which specified the requirements for the prime mover engine. The “Aviation Week” article of October 7,1957, had noted that the prime mover engine likewise furnished the power to move the aircraft after the wheel movers had been attached to the wheels.
Paragraph 3.7.1.7, “No-Spin Provisions,” incorporates a principle invented about 1900. It is a device placed in the differential of a pair of wheels which are driven by a source of power (such as the rear wheels of an automobile) and prevents one of the wheels that is on a slippery surface, and would normally spin, from spinning, as long as the other wheel is on a good surface and has traction. The principle became known to Mr. Gregory in approximately 1944, was in common usage when paragraph 3.7.1.7 was being written, having been incorporated in tow tractors previously procured by the Air Force, and was suggested to Mr. Gregory, for inclusion in the specification, by the hydraulic experts at Wright-Patterson. The device referred to was also sometimes known as “locking differentials” or “limited slip differentials.”
Plaintiff’s project engineer, Mr. Enyeart, conceded during *434liis testimony that this feature was conveyed to the Air Force at the tests held at the Loring AFB, in March 1959.
The sentence from paragraph 3.7.2 beginning “Engine torque” is a standard sentence used by the Air Force in its specifications for procurement of commercial engines.
D. Other Facts as to the Specification.
The complained-of part of paragraph 8.6.1.1 merely specifies that the unit was required to apply moving energy to the aircraft wheels by hydraulic means. Mr. Enyeart conceded, in his testimony, that this concept was disclosed by the “Aviation Week” article of October 7,1957.
Paragraph 3.7.1 merely established broad design requirements and gave a proposed bidder no design or engineering data.
Paragraph 3.7.1.3 does not disclose engineering or design data; it sets forth requirements only. The principal problem involved is to provide a control to regulate the speed of the engine while the hydraulic pumps are in operation. The problem is a standard one, occurring frequently whenever there is a need to govern the speed of an engine operating something that requires regulated speed. The hydraulic pumps referred to in the first sentence of this paragraph were standard commercial items, were not proprietary to plaintiff and plaintiff made no claim that they were. This was conceded by plaintiff’s project engineer, Mr. Enyeart, during his testimony. With respect to the second sentence, Mr. En-yeart further acknowledged that the “Aviation Week” article of October 7,1957, disclosed that the pumps of the unit described there were operated by the prime mover engine.
Paragraph 3.7.1.7 discloses no detail design data, but rather presents a design problem for a no-spin feature, which is noted above to have been well-known.
With respect to the quoted part of paragraph 3.7.2, it is necessary in hydraulic systems to govern the speed of the engine in order to control the energy going into the hydraidic pump. The type of speed control called for by the specification was very conventional, and was in general usage long before 1959. This part of the specification refers to a standard commercial engine and to a standard governor, as was *435conceded by plaintiff’s project engineer, Mr. Enyeart, during his testimony.

Item 6. Selective Single or Dual System Operation

A. The Claimed Secret Information:
Two or Four Wheel Drive. — Under most conditions, two wheel movers could provide all the torque necessary to move the B-52. The system did require four during adverse conditions such as ice, snow or grade climbing. It was necessary, therefore, to devise and develop a system which would allow a single pair of WMU’s to be used rather than both pairs, thus saving installation time.
A unique concept was developed whereby the operation had the option of installing two WMU’s rather than all four when relatively light drawbar conditions were to be met. When only two wheels were to be driven, a switch on the remote control box caused the electrical system to hold the unused pump in neutral or zero flow position, thus deactivating one hydrostatic transmission while the second pump operated in response to input signals in the normal manner, powering the two WMU’s which were attached.
B. The Complained-of Part of Specification 27199:
(6) Selective Single or Dual Operation
These features are set forth in paragraph 3.6.1 which provides that “The unit shall be designed to apply the moving energy to one set of main landing gear wheels or both sets of B-52 aircraft from the main landing gear wheels as required to negotiate specified terrain under varying conditions. When power is not required on both sets of main landing gear front wheels, it shall be possible to completely detach one set of drive media and store same on the prime mover.” Paragraph 3.6.3.1.1 further provides “The unit shall be capable of performing the operation specified in 3.6.3.1(b) on dry surfaces by applying power to the wheels on only one front main landing gear of the B-52 aircraft.”
C. The Defendant's Source of the Information.
Both quoted sentences of paragraph 3.6.1 were substantially identical with those in the corresponding provision in the specification issued almost a year earlier on June 20, *4361958, R&D Exhibit WCLEG-58-48, for the procurement of the wheel mover from plaintiff under Contract No. 38249.
The first quoted sentence of paragraph 3.6.1, relating to applying the driving energy to either one of both sets of the B-52’s wheels, was a requirement dictated by SAC, which wanted to have the option of applying power to only one set of wheels or to both, depending upon the power needs at any given time. This feature is found in the “Aviation Week” article of October 7,1957.
The second sentence, providing that if one set of drive media was not being used, it should be possible to detach it from the aircraft wheels and store it on the power vehicle, was a requirement brought forward from the two earlier wheel mover research and development contracts with plaintiff. It was included in the specification because the Air Force considered it a valuable feature. This feature, also, was set forth in the “Aviation Week” article of October 7,1957. The concept was further reflected in an earlier patent with which Mr. Gregory was familiar (T7.S. Patent No. 2,409,552, filed May 27,1943, issued October 15,1946, col. 3, lines 1-7).
The requirement of paragraph 3.6.3.1.1, with respect to applying power to the wheels on only one front main landing gear, was a result of the Air Force’s attempt to reduce coupling time. If conditions were such that, in moving of a given aircraft, power needed to be applied to only one front main landing gear, the Air Force desired to be able to do so. Moreover, the concept of applying power to any one of a pair of wheels is disclosed in TT.S. Patent No. 2,539,010, issued January 23,1951, Column 5, lines 55-60, which Mr. Gregory had seen at the time he prepared the specification.
D. Other Findings as to the Specification.
The complained-of paragraph 3.6.1 does not disclose detailed design information. Plaintiff’s project engineer, Mr. Enyeart, conceded that the Specification WCLEG-58-48 issued about a year earlier on June 20,1958, for the procurement of the wheel mover purchased from Con Diesel under contract No. 38249, was a performance specification. As noted, *437paragraph 3.6.1 is substantially identical with the corresponding numbered paragraph of that specification.
The complained-of portion of paragraph 3.6.3.1.1 provides no detailed design information. It is a general performance requirement.

Item 7. Remote Steering, Speed and Direction Controls Including Steering

A. The Claimed Secret Information:
The design goal was to develop a light weight, easily carried control box which, through an electrical circuit, would be capable of controlling the electric actuators to follow any input signals accurately. The concept also required that the remote control be capable of providing a high speed range as well as a low speed range in the forward direction of travel.
These design goals were developed and achieved through use of a special Wheatstone bridge circuit in combination with a pivot-mounted speed lever in the remote control box. The speed lever operated in a quadrant spanning the full operating range from maximum forward through neutral to maximum reverse. The neutral or stop point was detented and operated a micro-switch, which accurately positioned the electric actuator at the zero pump flow position whether or not the Wheatstone bridge was properly trimmed. This guaranteed the aircraft would not move with the control m neutral. The forward position of the quadrant had two speed ranges. From neutral to the top of low range, two hydraulic motors were driving each WMU with speed proportioned to handle displacement from neutral. Upon passing into the high range, one motor was permitted to idle on each WMU through actuation of a solenoid valve, and the pumps were reduced to a half stroke to maintain the same motor output speed as the top of “low”. Further motion of the speed handle again mereased pump flow toward the maximum to achieve top speed. The manipulation of pump stroke to achieve coordination between high and low ranges was accomplished by special resistors which biased the basic Wheatstone bridge circuit of the shift point.
The final result was a unique remote speed control system which enabled the operator to accurately control a vehicle of great weight from a remote point with positive control of stop position and speed, both forward and *438reverse, with two speed ranges available for forward travel.
It was necessary to the concept that aircraft steering be accomplished from the remote control box with accuracy and with the aircraft as the only reaction point for steering forces. The foregoing was accomplished through hydraulic power steering cylinders which controlled the shape of a four bar linkage, one link of which was the aircraft itself! By use of this technique, all steering forces were reacted back to the aircraft. The remote control box contained a steering “tiller” which, through a second Wheatstone bridge circuit, controlled a solenoid valve which in turn controlled the steering cylinders. The tiller provided positioning signals with the circuit compared with the position of the parallelogram. When the two were not synchronized, the solenoid valve was actuated in the proper sense to restore synchronism.
B. The Oomplained-of Part of Specification %7199:
(7) Bemote Steering
This feature is described in paragraph 3.8.1 which states “Control and operation of the wheel mover unit and the aircraft being moved shall be accomplished with the operator riding the vehicle, walking ahead of the aircraft, or walking alongside the aircraft” when combined with the sentence in paragraph 3.8.2 — “Bemote Controls” which states that: “Electrically actuated remote controls shall be provided to control the wheel drive unit throttle, brakes, steering, etc.,” specifically requires remote controls which are electrically actuated.
C. Findings on Defendant's Source of the Information.
Paragraph 3.8.1 represents a feature publicized in the “Aviation Week” article of October 7, 1957. The paragraph as a whole resulted from Strategic Air Command requirements. Only qualified pilots were allowed in the cockpit of the airplane. Maintenance personnel were not 'allowed to enter the cockpits to move the aircraft, and qualified pilots were not available for this purpose. Therefore, the Strategic Air Command wanted the wheel mover operated in such a way that the aircraft could be moved by it without anyone in the cockpit. This requirement was the result.
With respect to paragraph 3.8.2, the use of remote controls on various types of equipment was not new to the Air Force *439and bad been used on other items. Mr. Gregory had seen such controls on Air Force equipment prior to preparing the specification and, in addition, the remote control concept was incorporated into TJ.S. Patent No. 2,539,010, issued January 23, 1951, col. 3, lines 48-64, for an aircraft propelling device, which patent Mr. Gregory had seen. Remote controls had, also, 'been one of the features, of the units previously purchased by the Air Force from Con Diesel under contract No. 38249.
D. Other Findings as to the /Specification.
Paragraph 3.8.1 provides no engineering or design data. Moreover, Mr. Enyeart conceded during his testimony that the concept set forth in the quoted sentence was shown in the article in “Aviation Week” of October 7, 1957, although it was not specifically stated that the controls were to be electrical.
Paragraph 3.8.2 does not disclose any engineering or design data. Mr. Enyeart conceded during his testimony that there would be very few electrical systems which would meet the disclosed requirements; that the specification does not explain how to achieve the electrical design that would meet the requirements set forth in this paragraph; that it gives no details as to the electrical equipment and components required to obtain the desired results.

Item 8. Electric-Hydraulic Servo System

A. The Claimed Secret Information:
Since remote control of the wheel mover system was a design requisite, it was necessary to use a servo system. Some pump manufacturers offer hydraulic servos with manual inputs at reasonable cost, but it was not practical to provide a manual input from a remote source. A low cost, accurate servo system was developed using manual input servo on the pumps and controlling them with electric actuators which responded to remote signals. This had a very desirable and unique by-product in that judicious selection of actuator response provided a rate of motion to minimize blowing of relief valves during acceleration by controlling the rate of change of flow from the pump. These actuactors also contained special centering switches which could be controlled by *440the operator to return the pumps to neutral in the event of runaway of the electrical remote control.
B. The Oomplamed-of Part of Specification 27199:
(8) Electric Hydraulic Servo System
This feature is set forth in the following paragraph 3.7.1 — “Hydraulic System” — “A complete hydraulic fluid system shall be provided consisting of the components required to perform all hydraulically-powered operations of the aircraft wheel drives, external steering system for the aircraft and the unit wheel drives”;
Paragraph 3.8.1 — “Vehicle Controls” — “Control and operation of the wheel drive unit and the 'aircraft being moved shall be accomplished with the operator riding the vehicle, walking ahead of the aircraft, or walking alongside of the aircraft. Use of the aircraft cockpit for a vehicle control station may be provided as an auxiliary control point, however, primary control operations shall be as specified above”;
Paragraph 3.8.2 — “Remote Controls” — “Electrically-actuated remote controls shall be provided to control the wheel drive unit throttle, brakes, steering, et cetera. The cable from the wheel drive unit to the remote control box shall be installed on a self-winding reel. The cable length shall be not less than 100 feet. The control box shall weigh not more than 10 pounds. A shoulder harness shall be provided for the operator as an aid in carrying the control box”;
Paragraph 3.11 — “Aircraft Steering Mechanism”, which states: “The aircraft shall be steered by means of a pantograph arrangement which does not depend on the wheel drive unit for steering reaction. The steering mechanism shall be hydraulically actuated and so designed that manual lift does not exceed the requirement of 3.5.4.3 for coupling to the aircraft. Weight of components used in the steering mechanism shall be the minimum consistent with good design practices. Attachment points for coupling the steering mechanism to the aircraft shall be through the towing lugs located on the bottom of the axle on each landing gear. All forces generated by the steering mechanism shall be capable of rotating the two front landing gear or two rear landing gear of the aircraft as required to safely control the aircraft when being moved under ramp and taxiway conditions specified herein. The steering mechanism shall not exert side loads on the wheel drive unit.”
*441C. Findings on Defendant's ¡Source of the Information.
The findings in Item 5, supra, on the source of the quoted first sentence of paragraph 3.7.1 in the Navy HE, 2S-1 helicopters, are here incorporated by reference. The concept of external steering referred to in that sentence, also, was previously brought to the attention of Mr. Gregory and his associates by, inter alia, the “Aviation Week” article of October 7,1957.
The findings as to paragraphs 3.8.1 'and 3.8.2, made in Item 7, supra, are here incorporated by reference.
Paragraph 3.11, calling for the so-called pantograph arrangement for steering, is based on the geometric concept of a parallelogram, in which opposite sides of .a quadrilateral are parallel. There is nothing new in the principle, and Mr. Gregory knew of it when he prepared the specification. The Air Force had previously procured trucks and trailers using a pantograph steering arrangement, with which Mr. Gregory was familiar.
D. Other Fundings as to the ¡Specification.
Paragraphs 3.7.1, 3.8.1 and 3.8.2 provide no specific design or engineering data.
Mr. Enyeart conceded that there would be various electrical systems which would meet the concept disclosed in paragraph 3.8.2; that the specification does not explain how to achieve the electrical design that would meet the requirements set forth .therein; that it gives no details as to electrical equipment and components required to obtain the described results; that it does not specify whether amplifiers are to be used; and that it does not even specify that the electrical circuitry had to be contained in the control box.
Paragraph 3.11, concerning pantograph steering, contains no detailed engineering or design data.

Item 9. Vehicular Retraction System

A. The Olavmed Secret Information:
By nature of the concept, the power vehicle had to be capable of following any path of movement of the aircraft when attached thereto for movement. On the *442other 'hand, when away from the aircraft, the vehicle required a conventional four wheel vehicular suspension system.
The Plaintiff supplemented the basic four wheel running gear with four dual casters which allowed the vehicle to follow any path of movement of the aircraft. These casters were retracted when the vehicle was apart from the aircraft and extended when it was attached. The retraction was vertical, providing 12-inoh ground clearance fully retracted and 12-inch ground clearance for the main vehicle wheels when fully extended. The retraction system was synchronized hydraulically through adjustable, pressure compensated, flow control valves so that all casters were in the same stage of retraction or extension at all times regardless of the symmetry of their respective loads.
The caster units were unique with 28 inches of vertical retraction capable of carrying 6000 pounds each when extended. This was accomplished by attaching a standard type dual wheeled caster to the end of a large diameter telescopic structural cylinder keyed against rotation, and whose travel was controlled by an internal, concentrically mounted hydraulic cylinder.
B. The Oomplained-of Part of Specification H7199:
(9) Vehicular Betraeting System
This feature is described in paragraph 3.5.6 which states that “Ground clearance of the wheel drive unit shall not be less than 12 inches for negotiating snow and ice covered taxiways, ramps and hard stands as a self-propelled unit with no aircraft being towed. The ground clearance shall not be less than 8 inches when the unit is positioned under the fuselage during aircraft movement operations”.
C. Findings on Defendant's Source of the Information.
Paragraph 3.5.5 was derived from the Air Force’s mobility specification, MIL-M-8090, which, in turn, sets forth requirements developed during the Korean War. Specification MIL-M-8090 was incorporated into the instant specification, MIL-W-27199, by reference.
D. Other Findings as to the Specification.
Paragraph 3.5.5 provides no specific design data.

*443
Item 10. Vehicular Satelliting System

A. The Claimed Secret Information:
The satelliting linkage was required to be as simple as possible since it had to be installed manually and yet be capable of controlling the position of the 13,000-pound power vehicle and providing the steering parallelogram.
As developed by Plaintiff, the satelliting linkage consisted of two “paddles” which were attached to the tow lugs of the aircraft landing gear, a main transverse beam which could be swung out from a stow point on the vehicle into engagement with the “paddles”, and a diagonal truss member which could also swing out from a stow position on the vehicle to engage with the for end of the transverse beam. This arrangement, consisting of four parts, comprised the necessary parallelogram for the steering geometry and the truss which related the castered vehicle to the aircraft at all times during movement.
Along with the requirement for simplicity, it was necessary to design the linkage with latching provisions which could accommodate a reasonable amount of “mis-position” of the vehicle during aircraft attachment operations.
The solution was the design and development of a unique over-center latch with jaws that opened wide to accept the mating part over a wide range of positions. Upon actuation of the latching handles, the mating part was drawn into design position with a large mechanical advantage which increased to infinity when the latch was fully closed. These latches were used to attach the “paddles” to the transverse beam. Latching was accomplished positively by this means and with little effort on behalf of the operator.
The problem of vehicle mis-position during attachment operations had to be solved with respect to the diagonal truss member. The required length of the diagonal member varied quite widely with even small changes in vehicle position.
This was solved by equipping the end of the diagonal member with a special extensible, closed loop, hydraulic member which could be extended or contracted to accommodate a large amount of mismatch and still be capable of connection. After connection was made, the member could be locked to the installed length by a small hand valve to hold the vehicle properly related to the aircraft.
*444B. The Complained-of Part of Specification §7199 :
(10) Vehicular Satelliting System
This feature is set forth in paragraph 3.6.1.1, which provides in the next to last sentence of the paragraph entitled “Power Drives” that: “The unit shall be designed and power applied to the aircraft wheels in a manner so that the unit will automatically follow the aircraft during movement operations.” This requires that the vehicle follow the aircraft and must be satellited thereto necessitating a system of casters.
C. Findings on the Defendant's Source of the Information.
The quoted part of paragraph 3.6.1.1 resulted from Air Force representatives having seen such a feature in patents they had examined as early as approximately 1950 (U.S. Patent No. 2,409,552, col. 6, line 75, col. 7, lines 1-4, and U.S. Patent No. 2,539,010, figure 1) and in the Con Diesel units the Air Force had previously purchased.
D. Other Findings as to the Specification.
The complained-of part of paragraph 3.6.1.1 provides no detail design information.

Item 11. Underbelly Configuration

A. The Claimed Secret Information:
A full size mock-up of an under-belly wheel mover version, dubbed the “Lobster”, was built and shown to Air Force representatives in 1959 at Loring Air Force Base. This configuration contained integrated wheel mover units which were the “claws” of the Lobster. The front wheels retracted when attachment was made to the aircraft and driving torque was reacted back to the vehicle.
B. The Complained-of Part of Specification 27199:
(11) Under-belly Configuration
This feature is described in the following paragraphs of the specifications:
Paragraph 3.5 — “Design and Construction”: “The unit shall be designed for positioning under the aircraft fuselage forward of front gear when moving the aircraft in order to assure quick coupling capability and to prevent interference with maintenance stands when entering and leaving docks”.
*445Paragraph. 3.5.5 — “Ground clearance of the wheel drive unit shall be not less than 12 inches for negotiating snow and ice covered taxiways, ramps, and hardstands as a self-propelled unit with no aircraft being towed. The ground clearance shall be not less than 8 inches when the unit is positioned under the fuselage of the aircraft during aircraft movement operations”.
Paragraph 3.5.5.1 — “The clearance between the underside of the fuselage and the top of the unit shall be not less than 8 inches when the unit is positioned under the aircraft for movement purposes. All dimensions are based on a normally inflated strut which provides 52 inches clearance from ground to underside of fuselage”.
Paragraph 3.6.1 — “Power Application” — “The wheel drive unit shall be capable of applying moving energy to the aircraft wheels in such a manner that no perceptible shock is transmitted to the wheels. The use of more than one unit or more than one power plant to accomplish aircraft movement shall not be acceptable. The unit shall be designed to 'apply moving energy to one set of main landing gear wheels or both sets of B-52 aircraft front main landing gear wheels as required to negotiate specified terrain under varying adverse conditions. When power is not required on both sets of main landing gear front wheels, it shall be possible to completely detach one set of drive media and store same on the prime mover. Movement of the aircraft shall be accomplished by applying torque directly to the aircraft wheels through the ring gear shown on Drawing X59D6253”.
C. Findings on the Defendant's Source of the Information.
The sentence in paragraph 3.5, calling for the unit to be under the 'aircraft fuselage, was the result of Air Force experience. The Con Diesel units produced under prior contracts were positioned in front of and off to one side of the aircraft wheels. In the second test at Loring AFB, the Air Force had not been able to pull the aircraft into and out of the maintenance “docks,” which are immovable stands by which entrance is gained to the aircraft when on the ground. This led the Air Force to the view that the wheel mover *446would have to be of “low silhouette” construction so as to go under the fuselage of the aircraft itself.
The wheel mover which Con Diesel delivered to the Air Force did not have this “low silhouette” or “underbelly configuration” feature. Con Diesel showed the Air Force a full scale “mock-up,” disclosing this feature, which it (Con Diesel) thought would meet the Air Force’s needs. Mr. Gregory, principally responsible for the drafting of this specification, had seen this feature on other wheel movers prior to seeing Con Diesel’s mock-up unit.
Paragraphs 3.5.5 and 3.5.5.1 were derived from the Air Force’s mobility specification, MIL-M-8090, which, in turn, sets forth requirements developed during the Korean War. That specification, MIL-M-J8090, was incorporated into the instant specification, 27199, by reference.
D. Other Findings as to the /Specification.
The quoted part of paragraph 3.5 provides no specific or detailed design information.
The quoted part of paragraphs 3.5.5 and 3.5.5.1 provides no specific design data. Further, the mock-up of the Con Diesel model, presented at the Loring AFB tests in early 1959, was observed by many persons.
Paragraph 3.6.1 has no relevance to Item 11, Underbelly Configuration. Several of the sentences of the quoted portion of paragraph 3.6.1 are complained of under Items 1,2 and 6, above.
The Issue of the Ring Gear Drawings
110. The request for proposals that was issued June 15, 1959, calling for proposals by July 15,1959, which ultimately led to the contract with Air Logistics Corporation, provided, inter alia, for certain wheel tests. These tests were to encompass various methods of using the positive drive method of moving the aircraft, including any method proposed by the contractor and those listed therein (finding 88, RFP Part Y, supra). Among the listed methods was one involving modification of the wheels of the aircraft in accordance with three specified drawings, AF Drawing Nos. 59D6253, 6254 and *4476255 (ibid.). The request for proposals also incorporated by reference the applicable specification, MTL-W-27199, as amended. The related paragraph, 3.5.4, provided that the drive method was to be determined through the aforesaid test program, and that the ring gear shown on drawing 59D6253 was to be part of the test program (finding 89, supra).
The chronological sequence and interrelationship between the aforesaid three drawings, corresponding drawings of Con Diesel (Nos. 2101-0032 and 2101-0030), the disclosure of the ring gear concept to the public in the “Aviation Week” article of October 7, 1957 and the further disclosure at the Loring AFB tests in March 1959, are as follows:
A. A reproduction of a photograph and sketch appearing on the first page of the article about Con Diesel’s unit appearing in “Aviation Week”, October 7,1957 is in the record as defendant’s exhibit 56, p. 137. The photograph (left) is of the wheel mover, powered by twin hydraulic pumps, showing the ring gear for transmitting power to the aircraft wheel, and the opposite gear on the wheel itself. The sketch (right) shows how the wheel mover is attached to the aircraft wheel.
B. Plaintiff’s drawing 2101-0032, in the record as plaintiff’s exhibit 54B, shows the modification of the aircraft wheel for the attachment of the ring gear. It was sent to the Government in November 1958 in connection with the proposed modification of the B-52 wheels by Bendix Corporation, so as to have modified wheels available for the tests to be performed on the Con Diesel unit then being procured by the Air Force under contract No. 38249 of October 7, 1958 (findings 55-56, supra). This drawing did not contain any restrictive legend asserting that it was proprietaiy, or any other statement placing any limitation on its use.
C. Plaintiff’s drawing 2101-0030, in the record as plaintiff’s exhibit 54A, supplements drawing 2101-0032. It is referred to on 2101-0032 and shows additional details of the ring gear depicted on drawing 2101-0032. It contains the Con Diesel restrictive-use legend, set out above in finding 54.
*448D. In about January or February 1959, the Air Force obtained permission from Con Diesel to use its ring gear drawings as a part of the specification then being prepared, later issued as MIL-W-27199 (finding 66, supra).
E. In March 1959, tests were conducted at Loring AFB of two wheel movers, one procured from Con Diesel under contract No. 38249 and another from the American Coleman Company. As previously found (findings 79, 80, supra) at those tests plaintiff openly distributed a brochure to the many persons present. Page 4 of that brochure, in the record as plaintiff’s exhibit 14, contains a picture of the ring gear and a drawing showing the ring gear bolted to the aircraft wheel and the driving ring opposite it, as part of the wheel mover.
F. Between April and June 1959, the Air Force prepared three drawings, 59D6253, 59D6254 and 59D6255.
(i) Drawing 59D6253 is substantially identical with Con Diesel drawing 2101-0032, except that it was modified by the Air Force to provide for three teeth, instead of two, at each point in the ring at which teeth are located.
(ii) Drawing 59D6254 is identical with Con Diesel’s drawing 2101-0030.
(iii) Drawing 59D6255 is very similar to 59D6253, except that it shows, on the right side, a circular depiction of the bolting of the ring gear with 12 bolts, whereas 59D6253 shows only a one-fourth section of that circular depiction.
G. Air Logistics did not use the ring gear concept to accomplish direct drive in its wheel mover. As is found above (findings 101, 103), Air Logistics presented a total of five different proposals for direct drive methods of attachment to the aircraft wheels, none of which utilized the ring gear concept. Three of these were preliminarily selected by the Air Force as most acceptable to it (ibid.). The direct drive attachment on the units ultimately delivered by Air Logistics was by what is known as a “Fawick Clutch”, made by the Fawick Company, which does not utilize the ring gear concept. The prototype used an expanding brake type of direct drive, which also does not utilize the ring gear concept. *449This method was used on the prototype as an interim measure only, because delivery of the Fawick Clutch could not be obtained in time for the prototype delivery, it being contemplated that the Fawick Clutch would be used on the production model.
The Issue of the Availability to Bidders of Plaintiff’s Wheel Mover
111. (a) During the procurement program which ultimately resulted in the award of contract AF 33 (600)-40112 to Air Logistics, the defendant promulgated a procurement plan dated June 22,1959, which provided in part:
The vehicle produced under Contract AF 33(600)-38249 will be supplied to the contractor receiving th? award contract as a guide to facilitate in the drafting of the new vehicle design.
The vehicle referred to is the second unit sold by plaintiff to the defendant under contract 38249; title to it passed to the Government on March 1959 (see finding 77, supra).
b. The definitive contract with Air Logistics Corporation, 40112, contained a provision, entitled “Part II — Government Furnished Property.” Finding 105, supra. Under this part several items were listed but not the wheel mover unit purchased from plaintiff under AF 33 (600)-38249.
c. There is no evidence that the wheel mover was shown to any bidder.
d. The wheel mover produced by Air Logistics for the Air Force pursuant to contract 40112 was designed by Air Logistics independently of any contributions, suggestions or data from Con Diesel, received either directly from Con Diesel or indirectly through the Air Force. See findings 87, 89, supra. Its representatives and subcontractors created their own design, based on their own knowledge and experience (ibid.).
CONCLUSION 03? Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

 This choice between witnesses is not to be taken as a decision that any of them testified to a knowing untruth. Testimony of events long ago, with memory all but obliterated in a palimpsest of successive, closely related events of emotional content, may be given in all sincerity and yet be particularly susceptible to “the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury” (Mr. Justice Brown, in The Barbed Wire Patent, 143 U.S. 275, 284 (1832)).

 To be established at a later darte by the Contracting Officer.

Substantially